In the
United States Court of Appeals
For the Seventh Circuit

No. 99-3841

Linda Patton and Sandra Branch,

Plaintiffs-Appellants,

v.

Indianapolis Public School Board,
Shirl E. Gilbert, individually and as the
former Superintendent of the Indianapolis
Public Schools, and Esperanza Zendejas,
as the Superintendent of the Indianapolis
Public Schools,

Defendants-Appellees.

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. IP 96-1515-C (M/S)--Larry J. McKinney, Chief Judge.

Argued May 10, 2001--Decided January 4, 2002


  Before Posner, Easterbrook, and Diane P.
Wood, Circuit Judges.

  Diane P. Wood, Circuit Judge.  Chaos
reigned in the pupil transportation
system of the Indianapolis public schools
as the 1993-94 school year opened:
children were left standing on the
streets, some buses arrived hours late,
and some children were delivered to the
wrong places. In time, the failure caused
heads to roll. Linda Patton and Sandra
Branch were among those who felt the
consequences: both were demoted from
their positions in the school system's
Transportation Department. Believing that
they had been singled out because of
their race and gender and for their
communication with a member of the School
Board, rather than for permissible
reasons, the two women sued the Board and
its former and current superintendents.
The district court granted summary
judgment for the defendants, holding that
the plaintiffs had not provided any
evidence that other similarly situated
employees were treated more favorably or
that their contact with the Board member
was constitutionally protected. We agree
that the defendants were entitled to

prevail, and we thus affirm the district court's judgment.

I

Both Patton and Branch are African-Americans, and both had a long and successful history with the Indianapolis Public Schools (IPS). Patton began working for IPS as a bus driver in 1973. She was promoted several times and in 1992 became Operations Manager. When the Director of Transportation took an indefinite medical leave of absence in July 1993, Patton was appointed the Acting Director of Transportation. As Acting Director, Patton was the head of the IPS Transportation Department (the Department). Branch began working for IPS in 1984 as a bus attendant. She too was promoted through the management ranks over the next several years, ultimately to the position of Base Supervisor. In July 1993, when Patton was promoted to Acting Director, she chose Branch to serve as the Acting Operations Manager.

Upon assuming their new positions, the plaintiffs analyzed the Department's readiness for the start of the 1993-94 school year. Effective that year, IPS had enacted a new "Select Schools Plan" ("the Plan"), which allowed parents to choose which school their children would attend. The Plan was expected to have (and had) a substantial impact on the Department because students would no longer necessarily attend the school closest to their home. The Department was assigned the difficult responsibility of designing and administering new bus routes and schedules.

As the beginning of the school year neared, the plaintiffs, fearing that the Department was unprepared, privately notified Board Member Hazel Stewart of the impending crisis. They acted in secret because (they claimed in affidavits) Stewart had told Patton that there was a policy against employees speaking with Board members. The plaintiffs discussed with Stewart the various problems they foresaw with the new transportation system and also shared their fears that, if and when the system failed, then-IPS Superintendent Shirl Gilbert was going to blame them.

Unfortunately for all concerned, Patton

and Branch's concerns proved to be justified. When the first days of school arrived, the new routes and schedules failed miserably. Bus routes were not properly developed, drivers did not know their routes, and buses did not arrive at their designated spots at the correct times. Bus drivers also were not given current route sheets, and the information necessary to update those sheets was not communicated within the Department. As a result, thousands of children throughout Indianapolis missed school, were stranded at bus stops waiting for buses that never came, or were dropped off at the wrong places at the end of the school day.

Serious problems require serious measures. In this case, Superintendent Gilbert (also an African-American) took personal charge of the "bus crisis," stationing himself at the central transportation office. During this period of time, Gilbert had an opportunity to observe Patton and Branch. He quickly developed the impression that they were unable to fix the mess themselves. This led him in September to tap the Director of Facilities Management, Donald Coleman (yet another African-American), to handle the burgeoning crisis. Gilbert also hired consultants from Mayflower Contract Services, Inc. (an IPS contractor) to help IPS identify the problems, reconfigure the bus routes, and recommend action.

The Mayflower consultants and Coleman told Gilbert that Patton and Branch were "in over their heads" and were incapable of solving the crisis. They stated that Patton and Branch had failed to organize the staff, had failed to ensure proper communication between the various subdepartments, and had resisted working with the consultants. As a result of these recommendations, Gilbert transferred Patton to the position of Base Supervisor and Branch to a Route Manager job. Both of those changes were demotions.

By late September and early October, IPS had ironed out most of its transportation problems. As a result of the crisis, however, the Mayflower consultants recommended that the Department be reorganized. Based on the recommendations and concerns of Coleman and the consultants, Gilbert decided that the

plaintiffs' demotions should be made permanent. He communicated this decision to them in letters dated March 4, 1994, which formally notified them of their demotions and specified the reasons for the unfavorable actions. Branch and Patton fought back with an appeal to the School Board, but it rejected their arguments and adopted Gilbert's recommendations on March 22. Six other employees in the Department also lost their jobs, were demoted, or were moved to positions of less responsibility.

On June 7, 1994, the plaintiffs filed charges with the EEOC, and, after receiving the obligatory right-to-sueletter, they filed a complaint against the School Board, Gilbert, and the current superintendent, alleging race and sex discrimination in violation of 42 U.S.C. sec.sec. 1981 and 1983 and Title VII of the Civil Rights Act of 1964, 42 U.S.C. sec. 2000(e) et seq. Specifically, they alleged that they had been demoted from their positions, refused promotions to higher positions, and reprimanded and harassed because of their race and sex. They also alleged that the demotions were made in retaliation for exercising their First Amendment right to speak with Stewart.

Defendants moved for summary judgment, arguing that the undisputed facts showed that all of the actions taken against the plaintiffs were done for legitimate nondiscriminatory reasons. The district court agreed, granting summary judgment for the defendants and dismissing all claims. The plaintiffs then filed this appeal.

II

In evaluating their arguments, we apply the familiar standard of review for summary judgments, looking de novo to ensure that the district court correctly decided that no material facts were in dispute (viewing the record in the light most favorable to Patton and Branch) and that the moving parties were indeed entitled to judgment under the law. See Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). We consider first the discrimination claims, and then the First Amendment/ retaliation claim.

A.   Discrimination and Hostile Environment

1.   Race and Gender Discrimination

The principal claim Patton and Branch advance asserts that they were demoted from their positions because of their race or gender, in violation of 42 U.S.C. sec. 1981 and Title VII. Under sec. 1981, "[a]ll persons within the jurisdiction of the United States shall have the same right . . . to the full and equal benefit of all laws . . . as is enjoyed by white citizens." 42 U.S.C. sec. 1981(a). Under Title VII of the Civil Rights Act, it is unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. sec. 2000e-2(a)(1). Discrimination claims under both Title VII and sec. 1981 are analyzed in the same manner. Eiland v. Trinity Hosp., 150 F.3d 747, 750 (7th Cir. 1998).

Because the plaintiffs do not have any direct evidence of discrimination, they have used the familiar burden-shifting method established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). To establish a prima facie case under McDonnell Douglas, the plaintiffs must prove, among other things, that similarly situated male or Caucasian employees were treated more favorably than they were treated. Id. at 802; see also Bratton v. Roadway Package Sys., Inc., 77 F.3d 168, 176 (7th Cir. 1996). We agree with the district court that Patton and Branch have not met this burden and thus that their case fails at the prima facie stage.

The plaintiffs point to two males whom they believe were treated more favorably than they were treated. The first is an African-American man who was charged in 1995 with sexual harassment, but was not demoted. But there is no reason to equate sexual harassment allegations (whether proven or not) with allegations about mismanagement of the transportation system of the entire school district.Furthermore, the individual in question was not even under the supervision of the same decision-maker.

See Timms v. Frank, 953 F.2d 281, 287 (7th Cir. 1992). The second proposed comparison is with a Caucasian man who served in management in the Department during the bus crisis, but who was not disciplined. Plaintiffs have offered no evidence about what responsibility this man had for the bus crisis  or whether others had found his performance wanting. The fact that IPS did not demote either one of these people thus tells us nothing at all about disparate treatment of the plaintiffs on the basis of race or gender.

Patton and Branch also argue that IPS had a policy of returning an employee to her previous position when a demotion was imposed. Thus, they argue, they suffered discrimination when they were demoted several steps down. Under the alleged policy, Patton would have been demoted from Acting Director to Operations Manager, and Branch from Acting Operations Manager to Base Supervisor;instead, Patton received the lower job of Base Supervisor, and Branch was made a Route Manager. Once again, they claim that the reason for the deviation in policy was their race and gender, but once again, they have failed to point to any other IPS employee, male or Caucasian, who received the allegedly "normal" treatment upon a demotion.

The plaintiffs never identified a Caucasian employee or a male employee who was in a supervisory position similar to that which either of them held, with similar responsibility for the bus crisis, who was not demoted to the same degree or discharged. Patton was the Acting Director of Transportation--the head of the Department. It is only logical that she and Branch, the person in the next highest position, would be forced to take the fall. The plaintiffs argue quite passionately in their briefs that they were scapegoats in the fiasco and that Gilbert even admitted that he was going to blame them for the problems. But why not? They ran the Department, and it is hardly out of line for a higher level manager to hold subordinates to the satisfactory performance of a task. Without some evidence that the obvious explanation is not the true one, plaintiffs are left with nothing. It does not violate sec. 1981 or Title VII for Gilbert to make them "scapegoats" (or

less pejoratively, hold them responsible), unless they were singled out because of their race or gender.

As a side note, even if the plaintiffs had established their prima facie case, IPS has shown that its restructuring decision was justified by legitimate, nondiscriminatory reasons. See McDonnell Douglas, 411 U.S. at 802-03. The Mayflower consultants recommended that Patton and Branch be demoted because they were ill-equipped to deal with the crisis. Patton and Branch have not offered any evidence that Mayflower was trumping up a story as a pretext for race or gender discrimination. The broader picture also is devoid of evidence of pretext. During the reorganization of the Department, eight individuals sufferedadverse employment actions and seven were promoted. Of the eight who suffered adverse employment actions, three were Caucasian males, two were African-American males, and three were African-American females. Of the seven who were promoted, one was a Caucasian male, two were African-American males, one was a Caucasian female, and three were African-American females. This evidence also tends to refute any allegations that Gilbert or the Board were using race or gender in making personnel decisions.

2.  Hostile Work Environment

A plaintiff may also establish a Title VII violation by proving that discrimination based on race or gender has created a hostile or abusive work environment. See Meritor Sav. Bank v. Vinson, 477 U.S. 57, 67 (1986). Patton alleges that she was subjected to a hostile work environment by her immediate supervisor, Coleman, and by Gilbert. She claims that Coleman treated her in a rude, abrupt, and arrogant manner, ignored her work-related suggestions and failed to keep her informed about changes at work. Finally, she alleges that Gilbert subjected her to "stern and severe criticism" after she took three days of sick leave in September 1993, in the midst of the bus crisis.

Although it is possible that Patton was unhappy at work and that Coleman and Gilbert had something to do with her

unhappiness, she has not stated a Title VII claim. First, a reasonable jury could not have determined that Patton's treatment was so severe or pervasive as to alter the conditions of her employment in a significant way. Id. Many employees have to put up with some amount of rude, arrogant, or boorish behavior at work; the alleged actions of Coleman and Gilbert fall far short of creating an actionable hostile work environment.

Second, Patton has presented no evidence to show that Coleman and Gilbert's treatment of her was based on her race or gender--she argues instead that the "abusive conduct was purely personal." This is fatal to her claim. See Johnson v. Hondo, Inc., 125 F.3d 408, 415 (7th Cir. 1997) (Under Title VII, a hostile work environment exists only when "the victim was singled out because of his or her gender [or race]."). Title VII "does not guarantee a utopian workplace, or even a pleasant one." Vore v. Indiana Bell Tel. Co., 32 F.3d 1161, 1162 (7th Cir. 1994). As long as the hostility was not based on a protected characteristic, Title VII is not implicated. See id.

B. Retaliation for Exercise of First Amendment Rights

Patton and Branch admit that they had a secret conversation with IPS Board member Stewart just before the school year started, during which they shared their concerns about the Plan and potential transportation problems. They allege that the School Board had a policy forbidding employees from speaking with Board members. Their demotions, they claim, were the Board's chosen method of enforcing this policy; its actions in so doing impermissibly infringed on their First Amendment right to free speech.

A state may not take adverse employment action against an employee "for reasons that infringe upon that employee's constitutionally protected interest in freedom of speech." Vukadinovich v. Board of Sch. Trustees, 978 F.2d 403, 408 (7th Cir. 1992). But not all speech by public employees raises constitutional concerns. To recover, the plaintiffs "must show (1) that the speech engaged in by the employee was constitutionally protected and (2) that the defendants retaliated

against [them] because of that speech."
Id. Here, even if Patton and Branch's conversation with Stewart was constitutionally protected (a proposition on which we express no opinion), the plaintiffs have not provided any evidence from which a reasonable jury could conclude that "the protected conduct was a 'substantial' or 'motivating' factor in the defendant's action." O'Connor v. Chicago Transit Auth., 985 F.2d 1362, 1368 (7th Cir. 1993). The plaintiffs have not presented any evidence to show that Gilbert even knew about their conversation with Stewart, much less that the demotions later recommended by Gilbert and approved by the Board were, even in part, based on the conversation. The district court's grant of summary judgment on this claim was correct.

   For these reasons, we Affirm the judgment of the district court for the defendants.