**Sharon A. WALKER, Plaintiff,**

v.

**BOARD OF REGENTS OF THE UNIVERSITY OF WISCONSIN SYSTEM and David Markee, Chancellor of the University of Wisconsin–Platteville, Defendants.**

No. 03–C–0066–C.

United States District Court, W.D. Wisconsin.

July 27, 2004.

David E. Rohrer, Madison, WI, for Plaintiff.

Michael J. Losse, Assistant Attorney General, Madison, WI, for Defendants.

## OPINION AND ORDER

CRABB, Chief Judge.

This civil suit for sex and race discrimination and retaliation was brought pursuant to 42 U.S.C. §§ 1981 and 1983 and Title VII of the Civil Rights Act. At trial, the jury found that defendant David Markee (and through Markee, defendant Board of Regents) discriminated against plaintiff Sharon A. Walker on the basis of her sex when he terminated her as an assistant chancellor at the University of Wisconsin–Platteville. The jury found against plaintiff on her claims that defendant had discriminated against her because of her race and retaliated against her for her exercise of her free speech rights.

The case is before the court on plaintiff's motion for equitable relief and pre-judgment interest and on defendants' motion for judgment as a matter of law or, alternatively, for a new trial. (Plaintiff has not challenged the jury's findings with respect to her race and First Amendment retaliation claims.)

After reviewing the evidence and the parties' arguments, I am convinced that despite the conscientious effort the jury made to reach its verdict in this case, it erred in finding that plaintiff's termination was motivated by sex discrimination. That conclusion was not a reasonable one. Even when the evidence is read in the light most favorable to plaintiff, as it must be, it does not support a finding that defendant Markee terminated plaintiff for any reason other than her unwillingness to carry out his directives and what he perceived as a management style that was affecting staff morale adversely.

Because plaintiff was an upper level administrator, serving at the pleasure of the chancellor, she was subject to termination at any time defendant believed that she was not doing the job he wanted her to do. It is not determinative that another person in defendant's position might have had different expectations for plaintiff or would have reached a different opinion about her job performance. Defendant's otherwise free-ranging discretion to fire plaintiff for any reason whatever was limited only to the extent that he could not fire plaintiff for any prohibited reason such as her sex. Because plaintiff did not adduce credible evidence from which the jury could have found that her sex played any part in defendant's decision to terminate her, I will grant defendants' motion for judgment as a matter of law and deny plaintiff's motion for equitable relief and pre-judgment interest as moot.

For the purpose of deciding defendants' motion, I find that the jury could have found the following facts from the evidence adduced at trial.

## FACTS

### A. *The Parties*

Plaintiff Sharon A. Walker is an African–American female. She has a Ph.D.

from Ohio State University and more than 22 years of experience in the administration of collegiate student affairs. In 1993, she was hired as Assistant Chancellor for Student Affairs at Platteville, with a starting date of January 1, 1994. As an assistant chancellor, plaintiff served at the pleasure of the chancellor, as did about 35 other persons at Platteville, including the other assistant chancellors, the vice chancellors, deans and directors. During her first two years, the then-university chancellor was pleased with her performance. He gave her annual merit pay increases and in 1996, a multi-year contract extending from 1996 to 1999. (Plaintiff does not contend that this contract changed the nature of her appointment. In any event, she retained her job for the duration of the contract.)

In August 1996, defendant David Markee became chancellor at Platteville. (Because it is only defendant Markee's actions that are at issue in this suit, I will refer to him simply as defendant.) Like plaintiff, defendant has a Ph.D. and extensive experience in student affairs. For the 14 years preceding his appointment as chancellor, he was Vice President for Student Affairs at Northern Arizona University. He has served on the national board of the National Association of Student Personnel Administrators and he is experienced in matters relating to intercollegiate athletics and in particular, with Division 3 athletics for smaller colleges.

B. *Defendant Markee's Reorganization Plan*

In defendant's two previous jobs, he had been part of a group of upper level administrators that had worked as a team to address critical campus issues, such as increasing enrollment and planning for expansion. Defendant saw the university's biggest challenge as maintaining and increasing its enrollment at a school located in rural southwestern Wisconsin in an area of declining population. The September 1996 enrollment had fallen by about 100, with a corresponding budget loss of about $500,000, and the number of high school graduates in the area was predicted to fall by one or two percent each year. Defendant believed that the university would have to market itself in a wider region to attract new students. His goal for the senior administrative team was the development of an enrollment management plan that would consider the campus's existing facilities, the academic programs, the resources for hiring additional faculty to meet new growth and the areas from which new students might come. He needed ideas for attracting more female students to a university known for its engineering and other technical schools and for building relationships through the tri-state region that would increase enrollment by as many as 1000 additional students. Defendant believed it essential that everyone in upper level positions take on specific responsibilities to meet this goal and help out their colleagues in the effort.

During the fall of 1996, defendant had a number of discussions with plaintiff about his ideas for reorganization, which eventually included shifting the Department of Admissions and Enrollment Management headed by Richard Schumacher from academic affairs to the division of student affairs under plaintiff; putting the Office of Career Planning and Placement into admissions; making plaintiff's assistant, Michael Viney, the director of student housing; and reorganizing food service and fine arts and moving them to the student center in an effort to generate the funds to build a new, self-supporting student center.

At an off-campus retreat held in December 1996, defendant met with his cabinet (vice chancellor, assistant chancellors, cer-

tain program directors and deans) to discuss enrollment targets, the budget and his reorganization plan. Defendant emphasized the importance of moving admissions and enrollment management to the Division of Student Affairs as the best place for establishing relationships with schools and parents of future students. He made a point of saying that everyone on the administrative team would have to be part of the enrollment management effort because he and Dick Schumacher could not do it all alone.

### C. *Richard Schumacher*

When defendant announced his reorganization plan, the director of admissions, Richard Schumacher, expressed his displeasure about moving admissions to the division of student affairs, where he would be reporting to plaintiff. He thought his office belonged in academic affairs, as it was in most other universities. Defendant told him the move was not negotiable and that he and Schumacher were going "to make the commitments to make this work." Tr. Transcript. 2–B, dkt. # 97, at 114.

When plaintiff became Schumacher's supervisor, she found him unwilling to meet with her on a regular basis to bring her up to date on his recruitment plans, his budget and any problems he was experiencing. He did not meet the time deadlines for completing the quarterly reports she expected from him; he often cancelled meetings or failed to attend staff meetings; and he complained to her about assignments, including plaintiff's directive to advise the student group she had assigned to him. Plaintiff reported these deficiencies to defendant, who said, "Oh, you know Dick. I'll talk to Dick. I'll get to Dick." Tr. Trans. 2–A, dkt. # 94, at 17. After defendant talked with him, Schumacher finished the report plaintiff was expecting.

In January 1998, plaintiff asked defendant to relieve her of the supervision of Schumacher. She believed she was being held responsible for supervising the recruitment function and was getting no cooperation from Schumacher, who still objected to being part of the division of student affairs. Tr. Trans. 2–A, dkt. # 94, at 18. In February 1998, plaintiff prepared an evaluation of Schumacher, in which she recommended the minimum salary increase for him. Defendant overrode her recommendation and gave Schumacher the next highest salary level increase. Schumacher had come close to meeting all of the enrollment targets for the year and had helped set in motion a significant number of outside activities and programs. Although defendant knew that plaintiff was not pleased with Schumacher's performance, he observed that the individual performance scores that plaintiff gave Schumacher justified a higher raise than she had recommended.

### D. *Sandra Stacy*

When Schumacher was moved to Student Affairs, he assumed the supervision of the Office of Career Planning and Placement, which was headed by Sandra Stacy. Before Schumacher took over, Stacy had reported directly to plaintiff, who had given her excellent evaluations and had recommended that she receive the highest level salary increase for the 1996–97 school year. Defendant had approved the recommendation. In the early fall of 1997, however, he began to have concerns about the operation of the Career Planning and Placement. He asked plaintiff why Schumacher had such a different opinion of the office and suggested that she make another assessment of the situation to see what was happening. He asked her again later in the fall after there had been some sort of incident and he wanted to know what the outcome had been. Plaintiff's only

response was to say that her assessment was accurate. Tr. Trans. 3–B, dkt. # 91, at 67.

Schumacher had problems with Stacy from the start. At one point, he went in to see plaintiff to tell her that Stacy was eating cereal and crocheting in her office when she should have been working. Plaintiff did not respond because she thought that "as the administrator for the department that [Schumacher] would have called [Stacy] in and talked about that, or it if continued, that he would have written her a letter. That that [sic] was not something that I needed to resolve for him. I just listened to his report." Tr. Trans. 2–A, dkt. # 94, at 11.

Before the placement officer was brought under Schumacher's supervision, the provost at the time, Ralph Curtis, had judged the office to be dysfunctional. Curtis thought it improved under Schumacher. "[R]egular office hours were being maintained, and the deans were indicating that things were going better." Tr. Trans. 1–B, dkt. # 95, at 29.

In December 1997, Stacy complained about Schumacher to Kathleen Kelley, affirmative action director. Stacy told Kelly that Schumacher had told her to "hang on to [her] girdle" because he wanted a "real Career Planning and Placement Operation," and that she would have "to bust [her] buns like [she] never busted them before" if she wanted to keep her job, Plt.'s Tr. Exh. # 60, at 1, that he was trying to supervise her more closely and that he was requiring her to keep a daily log of her activities for the rest of the year and telling her that she was to take her directives from him and not from plaintiff. Stacy filed a written complaint, listing her grievances against Schumacher.

In response to the filing of the complaint, defendant set up a meeting with Stacy, Schumacher and Kelley, at which Schumacher admitted making the offending comments to Stacy about busting her buns and hanging on to her girdle. Schumacher apologized for the remarks and promised never to make any similar ones. Stacy said she was comfortable with the apology.

As Stacy's supervisor, Schumacher was responsible for her annual performance evaluations. Stacy did not want Schumacher to do her evaluation after she had complained about him. In February 1998, the need for an outside evaluator and plaintiff's and Schumacher's widely contrasting views of Stacy's work performance led defendant to ask associate vice chancellor Judy Paul and assistant chancellor for business affairs Steve Zielke to undertake a comprehensive evaluation of Stacy's office and of her performance.

Although Zielke and Paul did not file their written report until May 1998, they talked to defendant frequently about their findings. From the time they began their investigation, their reports confirmed defendant's opinion that plaintiff had not made an accurate assessment of the Office of Career Planning and Placement. He believed that plaintiff had not gotten information directly from the staff in the office and that if she had she done so, she would have realized the existence of problems in the office.

In testimony given earlier at a Personnel Commission hearing and in statements in an affidavit, defendant said that he had set up the comprehensive evaluation of the Office of Career Planning and Placement before Stacy filed her complaint against Schumacher. At trial, he admitted that his previous testimony and averments had been inaccurate about the timing of his request to Zielke and Paul to evaluate the office.

### E. *Comments to Defendant about Plaintiff*

#### 1. *Al Thompson*

Al Thompson is an African–American. When plaintiff started at the university, Thompson was Director of Multicultural Student Services, reporting to plaintiff. In May 1997, Thompson met with defendant to tell him that he was resigning his position. He told defendant that he found his relationship with plaintiff intimidating and unsupportive, that it made him fear for the security of his job and that she was not the kind of manager he wanted to work for. Defendant did not ask him why he felt as he did. In his letter of resignation to the chancellor, Thompson wrote that he was grateful to plaintiff for her three years of support, that he would miss the many positive interactions he had had with her and that she was responsible for his development into a better administrator. In his Affirmative Action Exit Questionnaire, he listed "non-supportive environment" and "discrimination" as reasons for leaving and attributed these to plaintiff's sometimes hostile and non-supportive supervision. Def.'s Tr. Exh. # 30. Defendant did not see this exit questionnaire until after he had decided to terminate plaintiff.

#### 2. *Elise Rogers*

After Thompson's resignation, Elise Rogers was hired as Director of Multicultural Student Services. She served for less than two months in the fall of 1997, during which time she was absent for a total of about two weeks for the death of her father, for moving to Wisconsin and for defending her dissertation. Although plaintiff provided Rogers with organizational tools to help structure her work and recommended certain documents that would help her, plaintiff believed that Rogers had difficulty getting organized.

On one occasion, Rogers got into a shouting match with Tony Sherwin, another university employee. After plaintiff heard about the incident, she told Rogers that it was not appropriate behavior to shout at another person in the hall and that in the future, Rogers should discuss matters in her office.

On a second occasion, plaintiff was present when Rogers told a work group formed to help her prepare a draft proposal related to funding of diversity issues that she had not prepared her assigned five-page draft of the proposal. Upon hearing this, plaintiff brought the meeting to a close and talked to Rogers about her failure to complete her assignment. Rogers became upset and started shouting; plaintiff left the room and returned to her office, while Rogers stood in the hall, still shouting. Shortly thereafter, Rogers submitted her resignation. She told defendant that she could not work with plaintiff because she found plaintiff intimidating and not supportive. She said that when plaintiff called, she was afraid to lift up the telephone for fear that plaintiff would be asking for another report about which Rogers knew nothing.

Defendant believed that Rogers and plaintiff had had a shouting match; he did not know that plaintiff had not been shouting but had retired to her office when Rogers began to scream. He did not believe it mattered whether plaintiff or Rogers or both had done the shouting.

#### 3. *Jack Melvin*

Jack Melvin was a student at Platteville, active in multicultural affairs, president of the statewide residence hall organization and a member of the search committee that selected defendant. Shortly after defendant took office, Melvin met with him to discuss his concern that plaintiff viewed student government as an obstacle rather

than as a part of campus governance and that she did not consult with student organizations.

### 4. Staff of Career Planning and Placement Office

In 1997, either before Schumacher assumed the supervision of the Career Planning and Placement Office or just at the beginning of his tenure, two employees of the office told defendant that they were leaving their positions because they refused to work in the office any longer. They complained to him about their immediate supervisor, Sandra Stacy, and about plaintiff's refusal to look at the office.

### 5. Jack Krogman and Lisa Reidle

Jack Krogman and Lisa Reidle were the faculty representatives to the athletic department while plaintiff was assistant chancellor. In either the fall of 1996 or the spring of 1997, Krogman and Reidle met with defendant to ask that they be allowed to report directly to him instead of to plaintiff, as they had been doing twice each semester. They told defendant they had two primary concerns: plaintiff's management style was affecting both the morale and operation of the athletic department and they were not confident that issues affecting student athletes were being reported to defendant.

### 6. Jim Mueller

At some time after Mueller was hired as campus food services director, defendant ran into him on the mall. Mueller told him he was on his way to a meeting with plaintiff on food service and that he needed to find a list of things to discuss so that plaintiff did not pick out some area within food service where she could get in and "nickel and dime" him.

### 7. Gregg Heinselman

On one occasion, the student center director, Gregg Heinselman, told defendant that he was thinking of leaving because he could not function in his position under plaintiff. On an earlier occasion, he gave defendant the impression that plaintiff was trying to sabotage defendant's reorganization plan by the manner in which she had presented it to Heinselman.

### F. Meetings and Memoranda between Plaintiff and Defendant

Plaintiff and defendant met either individually or in group meetings approximately two to three times a week from August 1996 when defendant arrived on campus until plaintiff left in 1999. Also, they met once in early July 1996, before defendant was installed as chancellor.

### 1. July 1996 meeting

At defendant's first meeting with plaintiff, he told her that Ralph Curtis, the Platteville provost, had told him that plaintiff "micromanaged." Curtis does not remember having told this to defendant. At the same meeting, defendant told plaintiff that he wanted her to use key reports.

### 2. August 19, 1996 meeting

On August 19, 1996, defendant met with plaintiff and others to discuss the quality of student life, student involvement in campus governance and the need to improve the rate of student retention. Defendant emphasized his hope that instead of renovating the old student center, the university could build a new one in a better location on campus that would attract customers and produce revenue from food service operations to help make the center self-financing.

### 3. September–November 1996 meetings

In a series of meetings, plaintiff and defendant discussed his plans to reorganize the reporting relationships on campus and to do something about admissions and enrollment retention. In a meeting in September 1996, defendant "made it clear that he wanted [plaintiff] to use key reports." Tr. Trans. 2–A, dkt. # 94, at 51. However, in his final reorganization plan, defendant allowed plaintiff to keep two part-time employees as direct reports as she had requested. In several group meetings, defendant stated that he would need help from everyone if the university was going to reach its enrollment management goals.

In a meeting on November 1, 1996, defendant told plaintiff that her staff did not trust her and did not think that they had opportunities to make suggestions and that she tended to look for someone to blame when there were small problems instead of looking to see whether there was a systemic problem. He told her that she needed to free up time to work on enrollment management and to be part of his senior administrative team. Also, defendant told plaintiff specifically that she would need to engage in activities to support enrollment management. Tr. Trans. 3–B, dkt. # 91, 27–29.

### 4. May 1997 meeting

In May 1997, defendant met with plaintiff for his first formal evaluation of her. At the time, he felt positive about her and about the progress they were making. He thought she was beginning to see some of the benefits of the things they were doing that she had not supported initially. He gave her a strong recommendation, in part to encourage her to recognize that she was part of the campus leadership team. Plaintiff told defendant she hoped she would be compensated for supervising enrollment management and admissions. She listed the implementation of a student recruitment plan as a challenge for the 1997–1998 year.

Defendant gave plaintiff a raise of $4150, comparable to the raises of other administrators. For example, Steve Zielke, Assistant Chancellor for Business Affairs, received a raise of $4400 and Patrick Hundley, Assistant Chancellor for University Advancement, received $4090.

### 5. December 1997 meeting

In a meeting with plaintiff in mid-December 1997, defendant told her for the first time that he did not think they were getting along and that he was considering not renewing her contract. He told her that the staff was complaining about her, that Al Thompson had complained about her in his exit interview and that she had not done what he wanted her to do about recruitment. Until then, defendant had not told plaintiff precisely what he wanted her to do about recruitment. At this meeting, he explained that he wanted her "to be involved with recruiting in the sense of making contacts and building relationships with high school principals and superintendents." Tr. Trans. 2–A, dkt. # 94, at 60. Plaintiff told him that she was not interested in being a recruiter. *Id.* at 61.

Plaintiff was shocked to hear defendant's comments. She had not received any letters stating that she was deficient in her performance. She had had what she considered to be a positive evaluation the preceding June and her raise had just taken effect.

### 6. January 8, 1998 memorandum

In early January, defendant sent plaintiff a memo in which he told plaintiff that he wanted to talk to her about a manage-

ment plan that would allow "key administrators in student services to feel more responsible and effective at managing their areas." Plt.'s Tr. Exh. # 58. He directed plaintiff to reduce her large administrative group meetings to once every 4–6 weeks to give her time to devote "some high level time and energy" to the issues he had identified over the preceding year. *Id.* These included "support service issues intended to serve a larger international student population"; a review of the university system's diversity report and the campus's own diversity plan; and "establishing relationships within the community, region" and public schools. *Id.* He added that he thought plaintiff was "perfectly positioned to address off-campus issues related to these areas." *Id.*

### 7. *January 16, 1998 memorandum*

In response to defendant's January 8 memo, plaintiff wrote defendant that she would be willing "to negotiate a plan" for working with him. Plt.'s Tr. Exh. # 59. She said that she was "philosophically opposed" to a return to the former structure of reporting in which only a few people were involved in meetings and only those few knew what was going on. She told defendant that although she thought his "request represented micro-management at its very worst," she was willing to propose monthly meetings with her staff on a trial basis but would request "the freedom to meet more frequently if the need arises." *Id.* at 2. With respect to expanded services for international students, she wrote that earlier efforts to improve such services for international students had not been successful but that she would be happy to do what she could to accommodate the students. She added that adequate financial support would be necessary. *Id.*

As to the diversity plan, plaintiff told defendant that she was not sure whether he was expecting her leadership for the report or simply her involvement in the process. *Id.* She said that she had convened a work group to discuss an update of some sections of the plan and was "more than willing to continue working with the group." *Id.*

With respect to establishing relationships, plaintiff listed the community activities in which she was involved but questioned whether it was consistent with her role to manage the day-to-day operations of programs for students on the campus or to visit schools. She told defendant that

> This section of your letter is of great concern to me. I believe that I am being directed to become the minority or rather the African–American recruiter for the University. This is not a position which I have ever held, not a position for which I accepted employment at this institution, and not a role I am interested in assuming.
>
> This request appears to blatantly overlook the obvious responsibility of the Dean of Admissions and Enrollment Management for establishing the very contacts which you describe.

*Id.* at 3. She added that in her more than 21 years of employment, she had rarely been asked "or had to assume responsibility for a task within the position description of one of [her] employees." *Id.* She added, "Is this directive based on my ethnicity? If not, why has this assignment been give to me?" *Id.*

When defendant wrote the January 8 memo, he was still optimistic that plaintiff's performance would improve and that they would be able to work together in the areas he had identified. When he read her response, he saw that he had made no progress in a year and a half in getting plaintiff to understand what she needed to do to take on what he defined as a senior administrator's responsibility. When he

read that she wanted to "negotiate" and was "philosophically opposed" to his requests to free up her time, he thought he had little chance of recovering a positive relationship with her. Tr. Trans. 3–B, dkt. # 91, at 81. He believed that her response to the international student initiative relied on outdated information and asked for more financial resources without incorporating any ideas for improvement; his request for action on the diversity report showed that plaintiff had not taken direct responsibility for the writing of the report or assigning it to someone who could, although the deadline for the report was imminent; and she made it clear to him that she was not going to follow his directive to become involved in student recruiting. He believed that she understood from previous conversations that he was not asking her to take on the role of minority student recruiting.

### 8. *January 21, 1998 meeting*

Defendant met with plaintiff on January 21, 1998, to review the memos they had written. Defendant said that the memos showed that the two of them disagreed fundamentally on the role of a senior administrator in student affairs at a campus like Platteville. He said, "Sharon, you're telling me that you're not going to do a reasonable request that I am asking of you" and she responded, "Yes, I'm not." Tr. Trans. 3–B, dkt. # 91, at 89. He asked, "[D]o you know what this means? You're telling me you're not going to do something that is a reasonable request" and she said, "[Y]es, I do know what that means." *Id.* After additional discussion, he told her that his directives were not negotiable and that she was going to have to organize and free up her time to help in other areas. *Id.* at 90. At the end of the meeting, he told her, "I'm not sure where we are going" and that they would need to meet again. *Id.*

### 9. *January 1998 memoranda from defendant*

At the end of January 1998, defendant sent plaintiff a copy of a memo from the president of Cardinal Stritch University in Milwaukee, announcing a conference on alcohol abuse. He made a note on the memo that plaintiff should consider attending and using the occasion to do some high school visits in the area. Around the same time, defendant sent a note to plaintiff, suggesting that she or Schumacher plan some recruitment activities in Milwaukee in connection with a visit there by a jazz group from the Platteville campus. Plaintiff did not attend the Cardinal Stritch conference and did not make any visits. She checked with Schumacher about the jazz group visit and learned that he was not planning to attend and had not identified anyone from the campus who was going. She took no other action on defendant's suggestions.

### 10. *March 1998 termination meeting*

In March 1998, defendant met with plaintiff to tell her he was not going to renew her contract. He told her that he was disappointed in her handling of the diversity plan, that she made poor choices on staff selection, such as in Career Planning and Placement, that she did not know enough about her staff and did not listen to others, that she was not empowering an excited staff and that he needed someone who could imagine where the university could be in five years and who could enlist support for such a vision. He told her that he saw her style as maintaining the status quo, controlling the inflow of information and protecting herself by assigning conflicts to staff members and asking for reports instead of leading the staff and confronting problems. Finally, he told her that her subordinates did not respect her

but thought she did not understand what was going on and did not get involved.

Defendant told plaintiff that she had a choice of resigning or being non-renewed and that he would keep her on to the end of the contract that the former chancellor had given her. Defendant said that over the next 15 months he would help her find a job. He did not consider reassigning plaintiff to another position on campus once she told him she would not comply with what he thought were reasonable requests of a senior administrator.

### G. *Plaintiff's Replacement*

Plaintiff remained in her position as assistant chancellor until the expiration of her contract in 1999. After she left, Michael Viney, the director of student housing, was made interim assistant chancellor of student affairs after receiving the unanimous recommendation of an interim search committee chaired by the associate vice chancellor for academic affairs. Although Viney had some uncertainty in the beginning about what defendant wanted in the way of recruiting effort, he developed a five-year enrollment plan during his first year, setting out steps for recruiting new students, and he now implements it.

One of his tasks under the plan is to identify opportunities for campus representatives to participate in activities such as high school commencements or visits to industries. Viney made only two or three visits off campus during his first year as interim assistant chancellor.

### H. *Athletic Department*

In the fall of 1997, plaintiff became aware that the women's basketball coach, Shelly Till, might file a Title IX complaint against the university. In November 1997, plaintiff asked defendant's permission to call the UW system's legal counsel to tell her about the potential complaint. Defendant refused the permission, saying it would not be appropriate to do so until a formal complaint had been filed and the university had collected the necessary data about its program compliance or lack of compliance. Plaintiff directed Mark Molesworth, the athletic director, to conduct a self-study of the department's practices to see whether they complied with the requirements of Title IX. (Defendant testified that he gave Molesworth the directive but plaintiff testified that she did and the jury could have believed her.)

Some six months later, when Till filed a formal complaint against defendant and Molesworth, defendant appointed Molesworth the chief contact with legal counsel, although plaintiff had authority over the athletic department. Defendant directed Molesworth to keep plaintiff and defendant informed of all developments. Molesworth made reports to plaintiff about the progress of the proceedings. In late April or early May 1998, after defendant had told plaintiff that he was terminating her, Molesworth told her that he and Provost Curtis were going to Madison to meet with the university system's legal counsel about Till's complaint. Plaintiff was not invited to attend the meeting.

Defendant considered plaintiff responsible for day-to-day operations of the department that related to the student athlete's life but not for matters such as personnel, policies or legal issues. Defendant kept these issues for himself both because of his prior experience with them and because the NCAA recommends that university chancellors take responsibility for the administration of intercollegiate activities on their campuses.

### OPINION

#### A. *Background*

Plaintiff brought this suit under both Title VII and 42 U.S.C. § 1983. To estab-

lish defendants' liability under either of these statutes for her termination from her position, plaintiff must demonstrate that her sex was a motivating factor in defendant Markee's decision. *Venters v. City of Delphi*, 123 F.3d 956, 973 n. 7 (7th Cir.1997) (Title VII); *Hunter v. Underwood*, 471 U.S. 222, 225, 105 S.Ct. 1916, 85 L.Ed.2d 222 (1985) (42 U.S.C. § 1983). (Although the board of regents is the responsible entity under Title VII, its responsibility is premised on Markee's acts because he was the decision maker.) A plaintiff may use direct or circumstantial evidence to meet this burden. *Desert Palace v. Costa*, 539 U.S. 90, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003); *Patton v. Indianapolis Public School Board*, 276 F.3d 334, 338 (7th Cir.2002) ("Discrimination claims under both Title VII and § 1981 are analyzed in the same manner"); *Malacara v. City of Madison*, 224 F.3d 727, 729 (7th Cir.2000) (using same framework to analyze claims under § 1981, § 1983 and Title VII).

To demonstrate discrimination, a plaintiff may rely on remarks by decision makers or behavior that acknowledges discriminatory intent or supports an inference of discrimination. *Troupe v. May Department Stores Co.*, 20 F.3d 734, 736 (7th Cir.1994). Plaintiff adduced no evidence of remarks by defendant that would evince discriminatory attitudes or support an inference of discrimination. (She adduced evidence of actions taken by defendant that she thinks would allow a jury to infer discrimination but which fall far short of doing so. See § D, *infra*.) Alternatively, a plaintiff may show that similarly situated male employees were given more favorable treatment. In this case, plaintiff cannot make this showing because she has no evidence that any other male administrator refused to carry out defendant's directives. *Id.* Finally, she can utilize the burden shifting method of *McDonnell Douglas v.*

*Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), showing that she is a member of a protected class; she was qualified for her position; she was terminated; she was replaced by a person outside the protected class; and the reasons that the employer articulated for her termination are not its true reasons.

### B. *Summary Judgment Motion*

At the summary judgment stage, plaintiff used the burden shifting approach. She established that she is within the protected class (females); she was terminated; and she was replaced by a person outside the protected class (a male). The question of plaintiff's qualifications for her job merged with the question of pretext, so I analyzed them together to determine whether plaintiff had adduced evidence that defendant's stated reasons for dismissing her were unworthy of belief. I identified the two reasons defendant relied upon for his decision: plaintiff's refusal to comply with his directives regarding recruitment and reorganization (reducing the number of persons reporting directly to her) and the adverse effect her management style was having on staff morale. (Although defendant cited additional reasons to plaintiff when he met with her in March 1998, I did not consider them on summary judgment because defendant did not argue that he had relied on them.)

■ I concluded that plaintiff did not establish pretext by showing that at summary judgment, defendant relied only on two of the reasons he gave plaintiff for her termination. His doing so did not demonstrate that he was giving new explanations or disavowing his earlier ones. An employer's shifting explanations may support a finding of pretext, but generally only when the employer tries to advance to reasons during litigation that he did not offer earlier, *O'Neal v. City of New Alba-*

*ny,* 293 F.3d 998, 1005–06 (7th Cir.2002) (jury could infer race discrimination from fact that defendants said first that they did not forward applicant's name to Public Employees Retirement Fund because he failed to pass physical examination and then said later that the reason was applicant's age), or when he disavows a previous reason. *Appelbaum v. Milwaukee Metropolitan Sewerage District,* 340 F.3d 573, 579 (7th Cir.2003) (although employer told plaintiff she was being fired for poor performance and breach of confidence, at trial employer maintained that poor performance had played no part in discharge). Plaintiff has never shown that defendant has disavowed any of the reasons he gave her for her termination or that he has come up with new reasons after the fact. Therefore, the only way that plaintiff could show that defendant's reasons were not his true ones was to show that they were factually baseless, insufficient to motivate the termination or not his actual motivation. *Gusewelle v. City of Wood River,* 374 F.3d 569, 577 (7th Cir.2004). (Under Title VII, a plaintiff trying to prove intentional discrimination by showing that the employer's stated reason is not worth of belief would have to show not only that it was factually baseless, but also that the decision maker did not honestly believe it. *Sembos v. Philips Components,* 376 F.3d 696, 701–02 (7th Cir.2004) citing *Helland v. South Bend Comm. School Corp.,* 93 F.3d 327, 330 (7th Cir.1996)).

Although plaintiff tried to show on summary judgment that defendant had no factual basis for his determination that she had resisted his efforts to engage in recruiting efforts, I found that she had failed. It made no difference that recruiting was not part of her job description when she was hired or that defendant did not make it clear what he wanted her to do. Neither Title VII nor the Fourteenth Amendment prohibits employers from changing job descriptions or reassigning tasks. I found also that defendant had not established that plaintiff ever refused outright to become involved in recruiting activities but that it was not necessary for defendant to show blatant defiance as a valid reason for termination of a non-compliant employee. Plaintiff had come forward with nothing to show that defendant did not have a basis in fact for his perception of insubordination. However, I did find that plaintiff was entitled to a trial because it remained disputed whether defendant had treated similarly situated employees more favorably. Plaintiff had adduced some evidence that white and male senior administrators declined to engage in recruiting and did so without consequence and that her successor had engaged in almost no recruiting efforts. If either or both of these things were true, the differential treatment could establish that defendant's first reason was pretextual.

At the summary judgment stage, I discussed plaintiff's resistance to defendant's reorganization efforts as a separate reason for her termination. Although it was a significant sticking point for defendant, it was part of the larger problem that plaintiff used her reporting arrangements as a reason why she could not take on the responsibilities of a member of the senior administrative team. Defendant wanted her to free up her time to build relationships throughout the community and the state to make the university more visible and thereby increase its enrollment.

As to defendant's belief that plaintiff's management style had created morale problems with her staff, I found that plaintiff had created some disputes of fact about the factual basis for defendant's belief. Also, I held that pretext could be shown by the lack of any evidence adduced by defendant that he had expressed displeasure with plaintiff's work before he

terminated her. (In retrospect, I may have overstated the validity of that conclusion as it bears upon sex discrimination. An abrupt turnaround in a performance evaluation implies an intervening event, not a condition that was known to the employer from the beginning. If the issue were retaliation for speech, the inference would be permissible. A positive performance evaluation followed by a subsequent firing (with intervening speech) and no expressions of displeasure between the positive evaluation and the firing would be strong support for a finding that the firing was in response to the speech. Where the issue is sex (or race) discrimination, the basis for the inference drops away. Why would an employer who is biased against women and wants to get rid of a female employee for that reason give the employee a positive rating at any time? Therefore, although I agree that giving an employee a positive evaluation and no other intimations of inadequate performance raises questions about the employer's motivation, I would not hold that it supports a finding of sex discrimination in the absence of other evidence of discriminatory motivation.)

## C. *Trial*

■ Although plaintiff prevailed on some issues on summary judgment, at trial she was unable to carry her burden of showing anything pretextual about defendant's perception that she was refusing to carry out his directives. She could not dispute his showing that she had refused point blank to assist him in building enrollment. She adduced no evidence that any other administrator had been asked to engage in recruiting and had refused, despite her representation at the judgment stage that she had such proof. She cannot plausibly maintain that Schumacher's responsibility for the recruiting program relieved her of any obligation to help out with the program for increasing enrollment when defendant had said repeatedly that he needed help in this area from all his administrators and from her in particular.

She did not show that defendant treated her successor, Michael Viney, more favorably than he treated her. True, Viney made only a few recruiting trips off campus during his first year, but he developed a five-year enrollment plan during that time. Plaintiff's alleged confusion about what she was supposed to do does not help her when she adduced no evidence that she ever asked defendant what he might be thinking she could do, made suggestions for steps she might take or even complied with the very specific suggestions he made to her about going to a conference or concert in Milwaukee.

(Throughout this case, plaintiff has treated the recruiting assignment as requiring her to visit high schools; defendant's directives were not limited to making high school visits or even focused primarily on such visits. As he testified, he wanted plaintiff to make herself known to people in the communities around Platteville and around the state. This might include speaking at a high school graduation ceremony or appearing at an event in the community. It would also include getting to know the principals and superintendents. Thus, for plaintiff to emphasize Viney's failure to make many high school visits is something of a red herring. Defendant wanted plaintiff to do *something* about recruiting; she did nothing.)

At trial, the evidence showed as it had not at the summary judgment stage, that defendant had talked with plaintiff on a number of occasions about her need to reduce the number of persons reporting directly to her so that she could free up her time for activities intended to boost enrollment, such as developing ties with

local high schools and parents. Plaintiff testified that defendant had talked with her about changing the way she structured her staff reports at their first meeting in July 1996, Tr. Trans. 2–A, dkt. # 94, at 50 (at July 1996 meeting, defendant told plaintiff that "he wanted [her] to use, quote, key reports"), that he talked to her about this again in September 1996, *id.* at 51, that a year and a half later she had still not trimmed the number of staff reporting directly to her, *id.* at 57, and that her response to his January 8, 1998 memorandum directing her once again to reduce her large administrative group meetings was to say that she was "philosophically opposed" to the idea. Plt.'s Tr. Exh. # 59.

The trial evidence cleared up any uncertainty about defendant's directives that existed at the summary judgment stage. No reasonable jury could have doubted that plaintiff was aware of defendant's suggestions to limit her conferences with her staff so that she would have time to help with enrollment and that she dragged her feet about implementing his suggestions because she did not agree with him. No reasonably jury could have believed that defendant did not have a factual basis for terminating plaintiff under these circumstances. No employee can refuse to carry out her employer's directives and expect to remain employed.

█ A plaintiff cannot establish pretext unless she can show that *all* of the reasons proffered for her termination are pretextual. *Olsen v. Marshall & Ilsley Corp.,* 267 F.3d 597, 601 (7th Cir.2001). Since plaintiff cannot show that it was pretext for defendant to say that he terminated her because of her refusal to comply with his directive to engage in activities to build enrollment, the discussion could end at this point. For the sake of completeness, however, I will discuss the other reasons that plaintiff contends were not based on facts

or were insufficient to motivate the termination.

█ Defendant based his decision to terminate plaintiff on her refusal to follow his directives *and* on his opinion that her management style was having an adverse effect on staff morale. Plaintiff failed to show at trial that defendant did not have a factual basis for his opinion. To the contrary, the evidence established that a number of people told defendant that they found plaintiff's management style intimidating and not supportive. Some of these same people told defendant that it was one of the reasons they were leaving the university or thinking of leaving. At summary judgment, it seemed possible that plaintiff would be able to show that defendant had not placed much weight on the comments of the three individuals (Sherwin, Thompson and Rogers) that defendant proposed as the basis for his opinion of plaintiff's management style. At trial, however, defendant adduced proof that defendant had heard from many more employees, all with the same sorts of complaints about plaintiff. The jurors could not have believed reasonably that defendant was not truthful when he told plaintiff that her management style was causing problems.

Plaintiff argues that defendant had no grounds for believing that she was responsible for the low morale on campus and therefore, was lying when he said he fired plaintiff because her leadership was harming staff morale. She notes that the president of the system had told defendant she was concerned about low morale on campus and had given defendant copies of two letters of complaints about plaintiff that she had received from people in the community, yet defendant never made any investigation of the letters or considered whether longer serving administrators were the cause of the low morale and not

plaintiff. Plaintiff asserts that defendant was never able to explain persuasively what plaintiff had done improperly with respect to the selection of the food services director or why defendant's evaluation of plaintiff should be so at odds with that of the North Central accrediting association, which had reviewed the campus shortly after defendant took office and gave high marks to student affairs.

Even assuming that administrators other than plaintiff were responsible for low morale on campus, that defendant failed to investigate the letters he received from the president, that defendant was unable to explain to plaintiff's satisfaction why he thought she did not show strong leadership in selecting the food service director or why the accrediting association should give high marks to a department he thinks is not being managed effectively, no reasonable jury could have found that these matters outweighed the credible complaints that defendant had received about plaintiff's leadership style. As I noted in the summary judgment order, defendant never said that he gave any weight to the letters that had been written before he arrived at Platteville. To the extent that plaintiff believes that other administrators contributed to the low morale at the university, she failed to adduce any specific evidence showing that their deficiencies were comparable to hers. Defendant explained the errors he thought plaintiff had made in the selection of the food service director: she did not include the director of the union or the director of housing in the selection committee although they would be the two administrators working most closely with the new food director and she did not seem to understand the need for a dynamic manager in the position. These are not illegitimate reasons for dissatisfaction. Finally, as I explained in the summary judgment order, the positive evaluation of the accrediting associa-

tion is of little relevance. An employer is free to disagree with other assessments of an employee's performance.

Plaintiff argues that the jury could have found that defendant did not reasonably rely on three of the complaints. She says that defendant never met Tony Sherwin, so defendant should not have relied on any complaints from this employee. I agree, which is why I omitted Sherwin from the list of complainants. The evidence at trial did not establish that defendant had first hand information from Sherwin.

Plaintiff argues that the jury could have found that defendant did not reasonably rely on Al Thompson's purported complaints about plaintiff because defendant did not see Thompson's exit questionnaire until after he had decided to terminate plaintiff and that Thompson might have been biased against plaintiff because she had disciplined him for budgeting failures. Had defendant terminated plaintiff on the sole ground that Thompson had complained about her, defendant's failure to investigate the reasons for Thompson's complaint might allow the jury to draw an inference of pretext. However, Thompson was only one of many. Both defendant and Thompson testified that Thompson made his comments about plaintiff when he met personally with defendant to say that he was leaving his position. Thompson explained that the positive letter he wrote about plaintiff was intended to be part of the record and he did not want it to include his negative feelings about plaintiff.

As for Elise Rogers, plaintiff argues that the jury could have concluded from the trial testimony that defendant should not have relied upon her complaints because Rogers was the problem and not plaintiff, a position defendant seemed to endorse when he told plaintiff that Rogers may

have been a bit manipulative. She adds that defendant's "cavalier" attitude about Rogers's leaving shows that he did not really rely on anything Rogers said but just wanted reasons to get rid of plaintiff. (It appears from plaintiff's brief that she is characterizing defendant's attitude as cavalier because he did not investigate whether both Rogers and plaintiff were involved in a shouting match or just Rogers.) Whoever was at fault in Rogers's leaving, the fact is that Rogers complained to defendant about feeling intimidated by plaintiff, confused about plaintiff's expectations and fearful. Rogers's complaint did not show defendant a complete picture of plaintiff but tended to fill out the picture. It tended to confirm Thompson's complaint and it was confirmed by complaints he received from other employees.

Even if the jury did not believe defendant's reliance on Thompson's and Rogers's complaints when he formed his opinion of plaintiff's leadership style, it could not have reasonably questioned the factual basis for defendant's opinion in light of the totality of the complaints that defendant received from Jack Melvin, the athletic board representatives, from the two staff members of the Career Planning and Placement Office, from Jim Mueller from and Gregg Heinselman. Plaintiff has not shown that defendant received similar complaints about other administrators in such quantity. An employer may discount one, two or three complaints about an employee; as the number mounts, the likelihood increases that a real problem exists.

Although defendant gave plaintiff's handling of the Office of Career Planning and Placement as one of his reasons for terminating her, it was only one reason for his decision. Because he had other reasons (plaintiff's refusal to carry out his directives to reduce her administrative staff meetings and help with enrollment management and the adverse effects upon staff morale of her poor leadership style) and plaintiff had not shown that these other reasons were pretextual, it is not necessary to discuss plaintiff's contentions that defendant ordered an investigation of the office only because he wanted to confirm that plaintiff was the source of any poor performance by the office and that he testified falsely in a prior proceeding that he had ordered the investigation before he knew that the head of the office had filed a complaint against Richard Schumacher.

A review of the evidence adduced at trial shows nothing from which a jury could reasonably have found that defendant's reasons for not renewing plaintiff's contract were dishonest, patently unreasonable, shifting or "deceit used to cover [his] tracks." *Clay v. Holy Cross Hospital*, 253 F.3d 1000, 1005 (7th Cir.2001).

### D. *Gender Bias*

█ It is not clear from plaintiff's brief whether she is arguing gender bias as a part of her argument that defendant's stated reasons for her termination were pretextual or whether she is arguing that the jury could have found from defendant's actions sufficient evidence of gender bias to show that sex discrimination was a motivating factor in defendant's decision to terminate her. I will consider it from the second point of view.

Before doing so, it may be helpful to say something about what is required for drawing an inference. "Inference" means an act or process, specifically, "the act of passing from one proposition, statement, or judgment considered as true to another whose truth is believed to follow from that of the former." Merriam–Webster Online Dictionary, http:m-w.com/cgi-bin/dictionary?book. When a person comes in with wet hair and clothes after having been outside, it is a rational inference to deduct that it is raining outside. Of course, the

inference can be rebutted by evidence that the person had been caught by an errant sprinkler or had chosen to jump into a pool with her clothes on; this does not mean that the first inference is not the natural one to draw in the absence of any other evidence. In analyzing plaintiff's proffered evidence, I have considered whether the "truth" that she thinks the jury could have drawn from that evidence follows naturally from that evidence.

Plaintiff testified that defendant stripped her of her authority to exert leadership in a matter involving the women's basketball coach. She argues that a jury could have found reasonably from this evidence that defendant did not want a strong female administrator responsible for leading the inquiry into the matter and that this is evidence of his sex bias. In other words, she is saying that a reasonable jury could find that any time an employer decides that a female employee should not take charge of a particular matter, the employer is demonstrating anti-female bias. This is not a natural inference. It may be a reason to look closely at what really happened, but it does not imply sexism in and of itself. Employers may have a plethora of reasons for deciding what employee should handle a particular issue. Even if the inference were a natural one in this case, it was rebutted by defendant's undisputed evidence that the university president had asked the chancellors to limit the number of people calling legal counsel and that defendant had the ultimate responsibility for athletic personnel, policies or legal issues, whereas plaintiff's athletic department responsibilities were limited to matters relating to the student athlete's life. Moreover, the incident occurred in November 1997, a time when plaintiff had still not freed up her time to take on the responsibilities of a senior administrator. The evidence does not support a conclusion that defendant's action was taken for sexist reasons.

Plaintiff adduced no evidence that defendant had allowed any male administrator in her position to call legal counsel on his own; the male athletic director, Mark Molesworth, was allowed to do so only after he had been named as a respondent on the complaint. There is a significant difference between denying plaintiff's request to alert legal counsel for the system before a complaint had even been filed and allowing Molesworth to consult with legal counsel after he was named a subject of the complaint. . Plaintiff argues that defendant involved the male provost, who was not named as a respondent, but the only evidence of the provost's involvement is a trip he made to Madison with Molesworth in late April or May 1998, after defendant had told plaintiff that he had lost confidence in her. Moreover, plaintiff has produced no evidence that defendant had anything to do with sending Curtis to Madison. Even if he did, no jury could infer from defendant's decision not to send plaintiff that he was doing so because of her sex, rather than because defendant had lost confidence in plaintiff.

Plaintiff argues that the jury could have believed that defendant's statement that plaintiff was not "a good fit" for her job was a pretext for gender related, stereotypical bias. She rests this argument on defendant's inability to explain what micromanaging was and why it was undesirable in a top administrator, his alleged opposition to her exertion of strong leadership over Schumacher, his inability to explain what she had done wrong in the selection of the food service director and his blaming her for her unwillingness to become involved in the disputes Schumacher and Stacy were having over the operation of the Career Planning and Placement Office and then going around her by assigning an

investigation of the office to outside evaluators. To make it clear, the "not-a-good-fit" is a reason on which I am placing no reliance as far as determining whether defendant had a valid, non-pretextual reason for firing plaintiff. However, to the extent that the acts that plaintiff discusses are alleged to show gender related bias, I need to address them.

The argument is difficult to follow. Plaintiff seems to be arguing that after she refused to step in to help Schumacher sort out the problems he was having with Stacy or to make a new assessment of the office, defendant should have worked with plaintiff to address the problems between Stacy and Schumacher after it came to light that Stacy had filed a complaint against Schumacher. Defendant's failure to do so, she argues, could be reasonably interpreted by a jury as gender bias "in that he was opposed to [plaintiff's] strong leadership and attention to details when it came to a male administrator like Schumacher, but at the same time used [plaintiff] as a scapegoat for the problems caused by the same male administrator." Plt.'s Br., dkt. #108, at 73. In other words, after plaintiff refused three requests to work on the Career Planning and Placement Office controversy (one from Schumacher and two from defendant), defendant exhibited sex bias by seeking help elsewhere. No reasonable jury could have reached such a conclusion.

Plaintiff maintains that defendant's attitude about her handling of the Rogers and Stacy matters is "blatantly sexist," Plt.'s Br., dkt. #108, at 74, because defendant faulted her for her failure to manage the matters properly, even though he had agreed that Rogers was manipulative and even though Stacy was under Schumacher's supervision. The jurors could have found that defendant's attitude was blatantly sexist only if they had speculated.

Defendant had reasons to be concerned about the handling of both matters.

Plaintiff is not persuasive when she argues that it was sexist for defendant to blame her for problems in Sandra Stacy's office because the office was under the supervision of Schumacher when defendant made his comments. She had been supervising the office up to the time that Schumacher took over the supervision. It was not sexist for defendant to hold her responsible for the state of the office under her supervision.

Plaintiff says that defendant's sexism is demonstrating by his "giving in" to Schumacher's request to report directly to defendant. She ignores the fact that she asked defendant to relieve her of the responsibility of supervising Schumacher.

Plaintiff tries to bolster her gender bias argument with the example of Thompson's complaint, arguing that defendant's failure to investigate Thompson's criticism of plaintiff shows that he took criticism from male administrators at face value and then used the criticism as a reason for terminating plaintiff. This argument ignores the totality of criticism that defendant received from employees of both sexes, as I explained earlier.

As additional incidents of alleged gender bias, plaintiff asserts that defendant dismissed her concerns and those of two female staff members that morale would suffer if his reorganization plan were implemented, calling the concerns speculative. Plaintiff cannot be seriously arguing that any disagreement with a female staff member is evidence of gender bias. In any event, defendant was even more dismissive of Richard Schumacher's concerns about the reorganization plan. In addition, she complains that when she was the recipient of a flood of sexist emails (she received thousands of copies of the same email from an unknown source that could

never be identified), defendant never asked to see the emails but merely suggested that she tell Provost Curtis about the matter. Curtis told her to shrug off the emails just as another female recipient had done with the same ones. She argues unpersuasively that defendant's suggestion demonstrates a dismissive attitude toward women and their concerns. There was nothing dismissive about defendant's suggestion to speak to Curtis; to the extent that Curtis was dismissive, that is not defendant's fault. In fact, as she testified, defendant called her the following week about something else and asked about the email situation and whether the sender had been identified. (Tr. Trans. 2–A, dkt. # 94, at 67.)

██ Plaintiff suggests that it is evidence of defendant's sexism that when Heinselman complained about plaintiff's presentation of the reorganization plan, defendant thought she was trying to sabotage the reorganization even before it started whereas when Schumacher complained about the proposal, defendant gave him merit increases. This alleged differential in treatment cannot support a finding of sexism unless plaintiff can show that she and Schumacher were similarly situated. She acknowledges implicitly that she cannot make this showing when she argues that she need not make such a showing after a jury trial. Plt.'s Br., dkt. # 108, at 77. She is incorrect about the law. Differential treatment does not permit an inference of discrimination unless the people subject to the treatment are similar in all critical respects, that is, that they are similarly situated with respect to performance, qualifications and conduct. *Radue v. Kimberly–Clark Corp.*, 219 F.3d 612, 617 (7th Cir.2000). "This normally entails a showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar con-

duct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Id.* at 617–18. A plaintiff "need not show complete identity in comparing himself to the better treated employee, but he must show substantial similarity." *Id.* at 618. Plaintiff and Schumacher were not similarly situated. Schumacher was carrying out the directives that defendant had given him; plaintiff refused to do so. *Haywood v. Lucent Technologies*, 323 F.3d 524 (7th Cir.2003) (evidence of differential treatment not probative when offenses are not comparable).

## CONCLUSION

In sum, I conclude that no reasonable jury could have found from the evidence adduced at trial, viewed in the light most favorable to plaintiff, that sex discrimination played any part in defendant's decision to terminate plaintiff from her position as assistant chancellor. Therefore, I must overturn the jury's verdict and enter judgment for defendants. This conclusion makes plaintiff's motion for equitable relief and pre-judgment interest moot.

## ORDER

IT IS ORDERED that the motion for judgment as a matter of law filed by defendants Board of Regents of the University of Wisconsin System and David Markee is GRANTED; defendants' alternative motion for a new trial is DENIED as moot; and plaintiff Sharon Walker's motion for equitable relief and pre-judgment interest is DENIED as moot. The judgment entered in favor of plaintiff on February 27, 2004 is VACATED and the clerk of court is directed to enter judgment in favor of defendants on all of plaintiff's claims and close this case.