# In the
# United States Court of Appeals
## For the Seventh Circuit

———————

No. 04-3143

SHARON A. WALKER,

*Plaintiff-Appellant,*

v.

BOARD OF REGENTS OF THE
UNIVERSITY OF WISCONSIN
SYSTEM and DAVID MARKEE,

*Defendants-Appellees.*

———————

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 03-C-0066—**Barbara B. Crabb**, *Chief Judge.*

———————

ARGUED JANUARY 10, 2005—DECIDED JUNE 9, 2005

———————

Before CUDAHY, KANNE and EVANS, *Circuit Judges.*

CUDAHY, *Circuit Judge.* Plaintiff Dr. Sharon Walker, former Vice Chancellor of the University of Wisconsin-Platteville, sued the Board of Regents of the University of Wisconsin System and David Markee, Chancellor of the University of Wisconsin-Platteville, under 42 U.S.C. §§ 1981 and 1983, and Title VII of the Civil Rights Act of 1964, claiming that her employment contract with the university was not renewed because of her race and/or her gender

and/or because she exercised her First Amendment speech rights. The case went to trial, and the jury exonerated the defendants on plaintiff's race discrimination and First Amendment retaliation claims but returned a verdict in favor of plaintiff on her gender discrimination claim. Following the verdict, the district court granted the defendants' motion for judgment as a matter of law, ruling that, given the evidence adduced at trial, no reasonable jury could have found for the plaintiff on her sex discrimination claim. Plaintiff now appeals the district court's ruling. We affirm.

## I.  FACTS & DISPOSITION BELOW

Plaintiff Dr. Sharon Walker was hired as Assistant Chancellor of Student Affairs at the University of Wisconsin-Platteville (UWP) in 1993, with a starting date of January 1, 1994. In this capacity, Walker served at the pleasure of the Chancellor of the University, meaning that she could be terminated by the Chancellor for any reason or no reason at all, as long as the termination was not discriminatory. This is so because the Chancellor typically depends heavily on the Assistant Chancellors to help implement his or her long-term vision for the university. From 1994 to 1996, the UWP Chancellor was pleased with Walker's work, gave her annual merit pay increases and, in 1996, a multi-year contract extending from 1996 to 1999.

Defendant Dr. David Markee took over as Chancellor of UWP in August 1996, replacing Walker's original boss. The record demonstrates that Markee came to the Chancellor's office hoping to implement an ambitious reorganization plan which he anticipated would involve everyone on the UWP administrative team, including Walker. Both Walker and Markee have Ph.D.s and extensive experience in university administration and student affairs. Unfortunately, during the two years following Markee's assumption of the Chancellorship, Walker's working relationship with Markee

became strained and, in a meeting on March 4, 1998, Markee informed her that he would not be renewing her contract. The parties' briefs are replete with factual quibbles and detailed accounts of minor incidents and interactions which do not merit exhaustive consideration here. However, the general sequence of events leading to the non-renewal of Walker's contract appears clear enough.[1]

As alluded to earlier, Markee apparently came to the UWP Chancellorship with a mandate to reinvigorate the university. One of Markee's organizational changes involved placing the Admissions Department, headed by Director of Admissions Dr. Richard Schumacher, within the Division of Student Affairs, under Walker's supervision. As part of the Department of Student Affairs, Schumacher took over supervision of the Office of Career Planning and Placement, headed by Sandra Stacy. Schumacher was highly critical of the Office and of Stacy, and he made his concerns known to Walker, who had consistently given Stacy excellent performance reviews. Stacy also filed a complaint against Schumacher for some offensive remarks he made to her in the workplace.[2] Markee convened a meeting to resolve this dispute and to make Schumacher apologize to Stacy, but Walker was not invited to the meeting. In the wake of this incident, and in light of Walker and Schumacher's widely contrasting views of Stacy's performance, Markee assigned two outside administrators to conduct Stacy's next performance review.

---

[1]  For a thorough and well-organized recounting of the relevant facts, *see* the district court's factual summary at *Walker v. Board of Regents of University of Wisconsin*, 329 F. Supp. 2d 1018, 1020-29 (W.D. Wis. 2004).

[2]  Schumacher told Stacy to "hang on to her girdle" since she would have to "bust [her] buns like [she] never busted them before" if she wanted to keep her job.

Apart from the difficulties between Schumacher and Stacy, Walker's working relationship with Schumacher soon fell apart. Both Walker and Schumacher had originally opposed moving the Office of Admissions into Student Affairs under Walker, and their reservations appear to have been well-founded. Walker complained that Schumacher was insubordinate and uncooperative, she gave him a poor performance review (recommending that he receive the minimum possible salary increase) and finally asked Markee to relieve her of supervising Schumacher in January 1998. Markee moved Schumacher out from under Walker's supervision as requested. He also overrode Walker's salary recommendation, giving Schumacher a salary increase one level above that recommended by Walker (who had recommended the minimum).[3]

In the fall of 1997, Walker became aware that the UWP women's basketball coach, Shelly Till, might file a Title IX action against the University. Walker asked Markee for permission to contact the University of Wisconsin System's legal counsel to advise her of the potential complaint. Markee denied her request, saying that it would not be appropriate to do so until a complaint actually had been filed and UWP had examined its own compliance with Title IX. Either Walker or Markee (testimonies conflict) then directed Athletic Director Mark Molesworth to conduct a self-study of UWP's compliance with Title IX. Till eventually did file a Title IX complaint against UWP, and Markee assigned Molesworth to be the principal contact with the UW Sys-

---

[3] There is some dispute about how the parties characterize Markee's handling of the Schumacher situation. The district court notes that Walker herself asked that Schumacher be moved out of the Department of Student Affairs, but in her brief Walker claims that Markee "rewarded" Schumacher for his insubordination by removing him from Walker's supervision and giving him an inflated salary increase.

tem's legal counsel, although Walker had administrative authority over the Athletic Department (as did Molesworth and Markee). Molesworth thereafter made regular reports to Walker concerning the complaint and the progress of proceedings. However, Walker evidently felt that she was being unfairly deprived of her rightful role in responding to the complaint.

In addition to these administrative difficulties, Markee received multiple complaints about Walker from both staff and students. Al Thompson, UWP's Director of Multicultural Student Services and an African-American man, told Markee he was resigning his position, at least in part, because of Walker's intimidating and unsupportive management style. The Director of Multicultural Services who succeeded Thompson (Elise Rogers, an African-American woman) resigned after less than two months following a "shouting match" with Walker, citing Walker's intimidating and unsupportive management style. The UWP student president of a statewide residence hall organization also met with Markee to discuss his concern that Walker did not consult with student organzations and viewed student government as an obstacle to campus governance. Two members of the Career Planning and Placement Office resigned in 1997, telling Markee that they could not work with Stacy (their supervisor), and that Walker refused to investigate their concerns. Two faculty representatives to the athletic department (Jack Krogman and Lisa Reidle) requested that they be allowed to report directly to Markee rather than to Walker, saying that Walker's management style adversely affected the morale and operations of the athletic department and that they feared Walker was not reporting issues affecting student athletes to Markee. Markee also received complaints from the UWP Food Services Director, and the Student Center Director told Markee that he was thinking of leaving UWP since he could not function under Walker's supervision.

It is clear that Markee and Walker also clashed directly over several issues during Markee's tenure. The most notable of these was Markee's plan, initially proposed in 1997, to implement a simplified reporting structure and reinvigorate UWP's student recruiting efforts. Pursuant to this plan, Markee asked Walker to free up time so that she could participate more actively in UWP recruiting efforts at public high schools. Walker contends that Markee's instructions were vague, but it is clear that Walker resisted this initiative and flatly refused to visit high schools. Walker wrote Markee a memo saying that she was "philosophically opposed" to Markee's organizational plans and that she did not want to assume new recruiting duties or make recruiting trips to public high schools. In the memo, Walker also questioned whether Markee assigned these recruiting tasks to her solely because of her ethnicity, stating her perception that Markee was effectively trying to make her the UWP recruiting director for minority or African-American students. At a subsequent meeting in January 1998, Walker again refused to participate in student recruiting as Markee requested, despite Markee's insistence that the new initiatives were non-negotiable. Later that month, Markee sent Walker a memo suggesting that she make some recruiting visits in connection with a conference in Milwaukee. Walker did not attend the conference or make any recruiting visits.[4]

As a result of all these incidents, Walker's working relationship with Markee became strained and, in a meeting on March 4, 1998, Markee informed her that he would not be renewing her contract. Markee gave Walker the choice of either resigning or being non-renewed, allowing her to stay on through the end of her contract, and he offered to help

---

[4] Walker and Markee also had several meetings and exchanged multiple memoranda during this period. Markee submitted his notes from these meetings into evidence, though Walker disputes the authenticity of the purported notes.

her find a new job over the intervening 15 months. Markee's proffered reasons for not renewing Walker's contract, broadly speaking, were that (1) Walker was unwilling to carry out Markee's directives to engage in reorganization and recruitment activities, (2) her management style was adversely affecting morale and leading to complaints by administration staff and (3) she had made poor choices with respect to staff selection and supervision.[5] Markee did not offer Walker a "backup" position or a demotion as he had to some other non-renewed staff members.

Walker stayed on for the full term of her contract and was replaced by Michael Viney, a white male who had previously served as UWP Director of Student Housing and received the unanimous recommendation of UWP's interim search committee. In his first year as interim Assistant Chancellor, Viney developed a five-year enrollment plan and, after some initial difficulty in setting up effective recruiting programs, made two or three off-campus recruiting visits.

---

[5] The district court summarizes Markee's proffered reasons for not renewing Walker's contract as follows:

> He told her that he was disappointed in her handling of the diversity plan, that she made poor choices on staff selection, such as in Career Planning and Placement, that she did not know enough about her staff and did not listen to others, that she was not empowering an excited staff and that he needed someone who could imagine where the university could be in five years and who could enlist support for such a vision. He told her that he saw her style as maintaining the status quo, controlling the inflow of information and protecting herself by assigning conflicts to staff members and asking for reports instead of leading the staff and confronting problems. Finally, he told her that her subordinates did not respect her but thought she did not understand what was going on and did not get involved.

329 F. Supp. 2d at 1028-29.

Walker commenced the present action on February 5, 2003 alleging race and sex discrimination under 42 U.S.C. §§ 1981 and 1983 and Title VII of the Civil Rights Act of 1964 against both Markee and The Board of Regents of the University of Wisconsin System. Walker amended her complaint to add a claim of First Amendment retaliation against Markee on May 16, 2003. The district court subsequently denied the defendants' motion for summary judgment, ruling that while "[p]laintiff had come forward with nothing to show that defendant [Markee] did not have a basis in fact for his perception of [Walker's] insubordination . . . . it remained disputed whether defendant had treated similarly situated employees more favorably. Plaintiff had adduced some evidence that white and male senior administrators declined to engage in recruiting and did so without consequence and that her successor had engaged in almost no recruiting efforts." 329 F. Supp. 2d at 1031. The district court also determined that Walker had demonstrated material questions about the factual basis for Markee's belief that Walker's management style created morale problems with her staff. *Id.*

The case was tried before a jury on February 2-6, 2004. At trial, Walker presented testimony from several UWP administrators (including herself and Chancellor Markee), copies of Chancellor Markee's notes from meetings with Walker, internal memoranda and performance reviews of Walker, Stacy, Shumacher and others. Walker argued that, when viewed as a whole, this evidence demonstrated that Markee was biased against Walker, treated her more harshly than the white male administrators on his staff and gave inconsistent, non-credible reasons for deciding not to renew her contract.

The jury ultimately found Markee liable for sex discrimination and, through him, the Board of Regents, awarding Walker $400,000 in damages. The jury exonerated the defendants of all claims of First Amendment retaliation and

race discrimination. However, on July 28, 2004, the district court overturned the jury verdict and granted the defendants' post-trial Motion for Judgment as a Matter of Law under Federal Rule of Civil Procedure 50, holding that no rational jury could have found for Walker based on the evidence adduced at trial. 329 F. Supp. 2d at 1038. The district court "denied as moot" defendants' alternative motion for a new trial. *Id.* Walker appealed this ruling on August 16, 2004.[6] Walker's appeal now comes before this court.

## II. JURISDICTION

The present action was brought pursuant to 42 U.S.C. §§ 1981, 1983, and the district court had jurisdiction pursuant to 28 U.S.C. § 1331. Following a jury trial, the district court granted the defendants' Motion for Judgment as a Matter of Law, reversing the jury verdict in favor of the plaintiff and dismissing all of the plaintiff's claims. This order represented a final resolution of all claims before the district court. Plaintiff timely filed her appeal on August 16, 2004. Accordingly, we now have jurisdiction over the present appeal pursuant to 28 U.S.C. § 1291, which provides for appellate review of all final orders issued by the district courts.

---

[6] Later, on October 18, 2004, the defendants filed a motion pursuant to Federal Rules of Civil Procedure 50(c)(1) and 60(b) and Circuit Rule 57 requesting the district court to indicate whether its ruling on the defendants' companion motion for a new trial was intended as a "conditional granting" of the motion under Federal Rule of Civil Procedure 50(c)(1) should this Court remand the case to the district court. On November 17, 2004, the district court denied the motion as untimely but acknowledged that meeting the high standard required for judgment as a matter of law also implied meeting the lower standard for a new trial. (Nov. 17, 2004 Order at 2, 4-5.)

### III. DISCUSSION

Upon conclusion of the jury trial below, the district court granted the defendants' Motion for Judgment as a Matter of Law under Federal Rule of Civil Procedure 50(a), ruling that "no reasonable jury could have found from the evidence adduced at trial, viewed in the light most favorable to plaintiff, that sex discrimination played any part in defendant's decision to terminate plaintiff from her position as assistant chancellor." 329 F. Supp. 2d at 1038. We review such a ruling *de novo*, "examining the record as a whole to determine whether the evidence presented, combined with all reasonable inferences permissibly drawn therefrom, was sufficient to support the jury's verdict" of sex discrimination. *Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1173 (7th Cir. 2002). We "will overturn a jury verdict for the plaintiff only if we conclude that no rational jury could have found for the plaintiff . . . a mere scintilla of supporting evidence will not suffice." *Id.* (quotations omitted); *See also* Fed. R. Civ. P. 50(a).

Additionally, the question "[w]hether the plaintiff has made a prima facie case drops away after trial," *Sheehan v. Donlen Corp.*, 173 F.3d 1039, 1043 (7th Cir. 1999), such that " '[p]ost-trial we consider only whether the record supports the resolution of the ultimate question of intentional discrimination,' " *Millbrook*, 280 F.3d at 1174 (quoting *Collins v. Kibort*, 143 F.3d 331, 335 (7th Cir. 1998)). And while the reviewing court must consider the evidentiary record as a whole, it must not evaluate the credibility of witnesses or otherwise weigh individual pieces of evidence. *Futrell v. J.I. Case*, 38 F.3d 342, 346 (7th Cir. 1994). Generally speaking, "[a]ttacking a jury verdict is a hard row to hoe." *Sheehan*, 173 F.3d at 1043.

As the district court correctly observes, a plaintiff alleging discrimination under Title VII may prove his or her case by either direct or circumstantial evidence. "Direct" evidence of discrimination is "evidence which *in and of itself* suggests

that someone with managerial authority was 'animated by an illegal employment criterion.'" *Sheehan*, 173 F.3d at 1044 (quotation marks omitted) (emphasis added); *see also Venters v. City of Delphi*, 123 F.3d 956, 972 (7th Cir. 1997). Such evidence "typically 'relate[s] to the motivation of the decisionmaker responsible for the contested decision.'" *Id.* (quoting *Chiaramonte v. Fashion Bed Group, Inc.*, 129 F.3d 391, 396 (7th Cir. 1997)).[7] It is "evidence that can be interpreted as an acknowledgment of discriminatory intent by the defendant or its agents." *Troupe v. May Dept. Stores*, 20 F.3d 734, 736 (7th Cir. 1994). In the instant case—as with most employment discrimination cases in this day and age—there appears to be no direct evidence of discrimination whatsoever. Walker has not identified a single piece of evidence that, by itself, demonstrates discriminatory intent by Markee.

Circumstantial evidence, by contrast, does not directly demonstrate discriminatory intent but supports an inference of such intent under the circumstances. We have identified three types of circumstantial evidence relevant to Title VII discrimination cases. The first is "suspicious timing, ambiguous statements oral or written, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn" *Id.* The key consideration is the totality of these "pieces of evidence[,] none conclusive in itself but together composing a convinc-

---

[7] The most common example of direct evidence is a statement by the decision-maker that betrays a discriminatory intent. "Even isolated comments may constitute direct evidence of discrimination if they are 'contemporaneous with the discharge or causally related to the discharge decision making process.'" *Sheehan*, 173 F.3d at 1044 (quoting *Kennedy v. Schoenberg, Fisher & Newman, Ltd.*, 140 F.3d 716, 723 (7th Cir. 1998)) (internal quotation marks omitted).

ing mosaic of discrimination against the plaintiff." *Id.* at 737. *See also Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 939 (7th Cir. 2003) (same). The second type is "evidence, whether or not rigorously statistical, that employees similarly situated to the plaintiff other than in the characteristic (pregnancy, sex, race, or whatever) on which an employer is forbidden to base a difference in treatment received systematically better treatment." *Troupe*, 20 F.3d at 736. Third is "evidence that the plaintiff was qualified for the job in question but passed over in favor of (or replaced by) a person not having the forbidden characteristic and that the employer's stated reason for the difference in treatment is unworthy of belief, a mere pretext for discrimination." *Id.*

Since there is no direct evidence of discrimination, the fate of Walker's claims must turn on the strength of the circumstantial evidence presented at trial. This evidence included testimony by various UWP administrators (including Walker and Markee) concerning Markee's relationship with Walker and other members of his staff, copies of Markee's personal notes from meetings with Walker, internal memoranda, performance reviews and other communications between Markee, Walker and others.

Taking the third category of circumstantial evidence first, Walker attempts to demonstrate that Markee replaced her with a white male (Mike Viney), that his proffered reasons for non-renewing her contract were pretextual and unworthy of belief and that Viney was treated more favorably than she without any rational justification. Walker asserts that Markee "trumped up" his complaints against her, and she implies that Markee fabricated or falsified the "meeting notes" that he submitted as evidence, trying to justify his actions against Walker after the fact.

Of course it is true that Walker was replaced by Mike Viney, a white male. However, there is no rational basis for concluding that Markee's proffered reasons for non-re-

newing Walker were pretextual or unworthy of belief. Even if Walker may succeed in casting doubt on the sincerity of some of Markee's reasons for terminating her, a plaintiff must show that *all* the purported reasons for the employment action were pretextual. *Olsen v. Marshall & Ilsley Corp.*, 267 F.3d 597, 601 (7th Cir. 2001). And here virtually all of Markee's proffered reasons for non-renewing Walker are supported by undisputed evidence. The many complaints Markee received about Walker by students and staff, her refusal to participate in Markee's recruiting initiatives and her resistence to Markee's organizational plans were all cited by Markee as reasons for refusing to renew Walker's contract, and they all stand unrefuted in the record. Against this backdrop of undisputed conflict and friction, there is little basis for disbelieving Markee's stated reasons for firing Walker, and there would appear to be no rational basis whatsoever for inferring sexist motives.

Along these same lines, Markee's selection and retention of Walker's replacement, even though of different sex and race, seem amply justified. It is undisputed that, although Michael Viney was less experienced than Walker when he took the job, he developed a five-year enrollment plan in line with Markee's recruitment initiative (which was subsequently implemented) and he made two or three off-campus recruiting trips during his first year as Assistant Chancellor. In short, the relevant evidence suggests that Viney was more cooperative with Markee's initiatives and more productive in implementing some of the policies which Walker had ignored or resisted. Walker's observation that Viney made "only" two or three recruiting trips during his first year in office does not alter this conclusion since Walker had made none at all despite Markee's repeated instructions to do so. Walker and Viney clearly were not similarly situated for Title VII purposes, and Walker's case gains no traction from such comparisons.

Turning to the second broad type of circumstantial evidence identified in *Troupe*, Walker attempts to demonstrate that similarly situated white male employees received systematically better treatment. Specifically, Walker argues that Markee responded differently to staff complaints about Walker than he did to complaints about Schumacher and Assistant Chancellor for University Advancement Patrick Hundley (including a gender-based harassment complaint against Schumacher). Walker also alleges that Markee treated her insubordination more harshly than Schumacher's. Yet these facts—even if assumed to be true—have evidentiary import only if Hundley and Schumacher are "similarly situated" to Walker, i.e., if they are "directly comparable to [plaintiff] in all material respects." *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002). The "plaintiff must show that [she] is similarly situated with respect to performance, qualifications, and conduct," and that the other employee "had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617-18 (7th Cir. 2000).

Walker is clearly not similarly situated to Hundley or Schumacher—those men held different positions, were responsible for managing different parts of the University, and, for aught that appears, were not the target of as many staff complaints as Walker. Walker also failed to adduce any evidence that either of them refused to help Markee with his organizational or recruiting initiatives as Walker had. In fact, it was undisputed at trial that Schumacher actually visited high school campuses on a regular basis. Additionally, while Walker argues that Markee "rewarded" Schumacher for his insubordination by taking him out from under Walker's supervision, Walker herself requested that Schumacher be so transferred. In short, there appear to have been obvious legitimate reasons for Markee's dif-

ferential treatment of Walker as compared to Hundley and Schumacher, and Walker introduced no evidence that might suggest an ulterior, sexist motive for these differences.

This leaves us with the first type of circumstantial evidence identified in *Troupe*: "suspicious timing, ambiguous statements oral or written, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn." 20 F.3d at 736. Here again, Walker points to alleged inconsistencies in Markee's statements and meeting notes regarding Walker's management style and performance problems. However, nothing in this litany of factual quibbles points toward gender-based discrimination. Even assuming, *arguendo*, that Markee's behavior was strange and inconsistent, nothing in the record supports an inference of sexism. The district court made a similar observation in its own order below, stating that "[t]he evidence does not support a conclusion that defendant's action was taken for sexist reasons." 329 F. Supp. 2d at 1036.

Walker also claims that Markee's refusal to let her participate in handling the Title IX complaint against the UWP athletic department demonstrates that Markee was biased against women in general (or at least strong female administrators). Yet the undisputed evidence shows that Markee chose the athletic director (Mark Molesworth) to handle the situation—an eminently logical choice—and only after Molesworth was named as a respondent in the Title IX complaint. Additionally, Walker was kept up-to-date as to the developments in the case, and she offers no evidence that other male administrators had more access to the Title IX proceedings, except for Markee himself, who did so at the behest of the university President. This chain of events simply does not support a logical inference of gender bias. *Cf. id.* at 1036-37.

## IV.  CONCLUSION

Overturning a jury verdict is not something that a court should do lightly. However, in light of all the evidence presented at trial, the district court appears correct that no reasonable jury could have concluded that Walker was a victim of discrimination without indulging in pure speculation. While Walker may be able to point to some inconsistencies and idiosyncracies in Markee's dealings with her, nothing in the record suggests that the ultimate decision not to renew Walker's contract was rooted in anything other than legitimate philosophical differences and performance-related concerns. The ruling of the district court is hereby AFFIRMED.

A true Copy:

      Teste:

_____
*Clerk of the United States Court of Appeals for the Seventh Circuit*