## In the

# United States Court of Appeals

## For the Seventh Circuit

---

No. 04-3990

VICKI HOSSACK,

*Plaintiff-Appellant,*

v.

FLOOR COVERING ASSOCIATES OF JOLIET, INC.,

*Defendant-Appellee.*

---

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 03 C 3067—**Paul E. Plunkett**, *Judge.*

---

ARGUED APRIL 13, 2006—DECIDED JULY 5, 2007

---

Before COFFEY, KANNE and WILLIAMS, *Circuit Judges.*

COFFEY, *Circuit Judge.* Plaintiff Vicki Hossack had an extramarital affair with a fellow employee, Nick Cladis, while working for Floor Covering Associates of Joliet, Inc. Subsequently, Hossack was terminated, but the employer did not discharge Cladis. Hossack claimed sex discrimination and sued for relief under Title VII, *see* 42 U.S.C. §§ 2000e-2(a), *et seq.* The jury returned a verdict in her favor, but the trial court, after a hearing, set aside the verdict and entered judgment as a matter of law in favor of the defendant. *See* Federal Rule of Civil Procedure 50(b). Hossack appeals, and on review we are convinced that no reasonable jury could have concluded that Hossack was a victim of intentional sex discrimination. WE AFFIRM.

## I.  BACKGROUND

Floor Covering Associates hired Vicki Hossack in October of 1997, and she was promoted to the position of office manager at the Joliet store in June of 2000.[1] The Joliet store was co-managed by Nick Cladis and Dave Lenz, Hossack's immediate supervisor. Lenz reported directly to Floor Covering Associates's president and owner, Robert Hill.

At trial, Hill testified that he was the sole owner of the parent company Floor Covering Associates, Inc. (FCA), located in Shorewood, Illinois.[2] The company manages the purchasing of inventory and distribution of products to its affiliated retail stores as well as providing support services such as payroll, human resources, and bookkeeping to its retail stores. Hill is the sole owner of three of the retail stores: Floor Covering Associates of Joliet, Inc.[3], Floor Covering Associates of Merrillville, Inc., and Floor Covering Associates of Naperville, Inc. Each of the three stores is separately incorporated, while Hill is the part owner of a store in Kankakee, which is also separately incorporated. When the events relative to this trial occurred, FCA, the parent company, employed twenty-seven people, the Joliet store employed thirty, the

---

[1] Hossack's work performance is not at issue in this case, as she always received top ratings in her performance appraisals.

[2] FCA began operating in 1976. The company sells floor covering and home furnishings, such as carpeting, hardwood flooring, ceramic tile, leather and upholstered sofas, bedroom sets, and window treatments. In 2007, FCA consists of six stores located throughout Illinois and Indiana. *See* Floor Covering Associates, Inc.—About Us, http://www.fcainc.com/about.asp (last visited Apr. 13, 2007).

[3] The Joliet store was actually located in Shorewood, Illinois, where it shared a building with FCA.

Naperville store employed fifty-four, and the Kankakee store employed nineteen. Each store is responsible for invoicing and for collecting all of the receivables, but the stores share neither inventory nor warehousing.

Hill referred to Hossack as the "head bookkeeper, the office manager" at the Joliet store. He testified that her duties included collecting all receivables, invoicing customers, preparing lien waivers, managing the inventory, counting the inventory on a monthly basis, answering questions for everybody, and issuing credit. As noted above, Cladis was employed by the Joliet store as a co-general manager with David Lenz. Cladis primarily concentrated on sales to builders.

In early 2001, Hossack and Cladis, both of whom were married and living with their respective spouses, as stated earlier, engaged in an extramarital affair. The affair lasted approximately eighteen months, until June 11, 2002, when Hossack's husband, Joseph Zastrow,[4] became aware of the affair upon discovery of letters from Cladis to Hossack, which she had secreted in her dresser drawer. He confronted his wife with the information and she, in turn, called the Joliet store the following morning and informed them that she was taking a personal day off. The following day, on June 13, 2002, Hossack again called the Joliet store and spoke with her supervisor, David Lenz, and requested permission to take her remaining eight vacation days in order to resolve her

---

[4] In the interest of clarity, we note that, based on the information in the record, Hossack and her husband, Joseph Zastrow, do not share a surname. Thus, throughout this opinion Joseph Zastrow is identified either by his surname, Zastrow, or by reference to his relationship to Hossack, while the use of "Hossack" indicates an explicit reference to Vicki Hossack, the plaintiff-appellant.

personal issues at home. Lenz approved her request for vacation time. At this point in time, no one employed by FCA or the stores other than Hossack and Cladis had any knowledge of the affair.

On June 17, 2002, Hossack returned to the Joliet store during her time off to fill out her time sheet and to complete the company's vacation request forms. While there, Hossack spoke with Lenz. She told him that she had been having an affair with Cladis, that after her husband found out about the affair he became emotionally upset, and that their daughter feared he might be suicidal. She explained that she was requesting the vacation time to deal with her marital problems and also informed Lenz that her husband did not want her to continue to work and be in contact with Cladis.

Lenz testified at trial that he interpreted Hossack's statements during this conversation as a resignation, but when Hossack took the stand, she disagreed and made it clear that she had not resigned. On direct examination, Lenz stated that:

> **Lenz:** She (Hossack) came to my office first thing in the morning to speak to me. She walked in the office, closed the door behind her and told me that she was going to have to quit. I didn't understand exactly why at that point in time and with just a very little bit of questioning, she came forward and she said, "Well, you're going to find out soon enough that I'm quitting because Joe's found out that I've been having an affair with Nick Clavis [sic]."

Transcript at 139-40. After meeting with Hossack, Lenz met with FCA's owner and president, Robert Hill, and informed him of his conversation with Hossack and said that she had resigned. Hill asked Lenz to arrange a meeting with Hossack the following day.

At Lenz's request, on June 18, 2002, Hossack met with Hill and Mary Gallup, FCA's director of human resources. Hossack did admit that, at the meeting, she told Hill and Gallup that it might be in the best interest of the company for her to quit because her husband did not want her to work with Cladis anymore. Hill, in reply, advised Hossack that she was a valued employee, that FCA wanted to retain her as an employee, and that he hoped he would be able to resolve the problem in a way that would be to everyone's satisfaction. Hill proposed three possible options: (1) Hossack and Cladis could continue to work together at the Joliet store; (2) Hossack could resign; or (3) Cladis could be transferred to the Naperville store. Hossack told Hill that she preferred the option of Cladis transferring to another store, but admitted at trial that Hill had made it clear that this option was not guaranteed because it had yet to be discussed with Cladis and Lenz. At the close of the meeting, Hill assured Hossack that management would remain in contact with her in the coming days while it reached a decision.

While Hossack was still on leave, her husband called Cladis on two separate occasions and warned him on each occasion to stay away from his wife. Furthermore, during one of these calls, Zastrow told Cladis that he "was going to make [Cladis's] life as miserable as he had made his" and that he would tell Cladis's wife of the affair. Cladis reported the telephone calls to Lenz.

On June 20, 2002, Gallup, Lenz, and Dan Majetich, FCA's executive vice president, met and discussed the problem in an attempt to help resolve the situation. Hossack's supervisors determined that transferring Cladis to the Naperville store was not in the best interest of the Joliet store because Cladis was the best-producing salesman at the Joliet store and that, based on the concerns that he had about Zastrow's behavior and threats, Hossack's continued employment at the Joliet store would

be disruptive. Cladis, who arrived several minutes after the meeting began, told the group that he had just spoken with Hossack and that she had indicated that she would not be returning to work. Thus, the assembled group decided to accept Hossack's resignation.

That evening, Hossack telephoned Lenz to inform him that she and her husband had reconciled and that he no longer objected to her working with Cladis at the Joliet store. According to Hossack, she was surprised when Lenz told her that the store had decided to accept her statement of resignation because of her husband's threatening behavior.

The following day, when Hossack went to the Joliet store to pick up her paycheck, she met with Lenz, who told her that Cladis was simply a better choice for the company because, in addition to his duties as co-manager, he was the top salesman and revenue generator at the Joliet store at this time. Lenz then asked Hossack to sign a voluntary resignation form, but she refused.

Later that morning, FCA sent a letter to Hossack, authored and signed by Gallup (FCA's director of human resources), confirming that, based on her statements of resignation to both Lenz and Hill, Hossack was terminated as of that date. The letter also stated that FCA did not plan to rehire Hossack because "it would be most disruptive to bring [her] back into this operation."

Cladis was neither discharged nor disciplined by the defendant for his role in the consensual affair with Hossack. Thereafter, on July 3, 2002, Hossack filed a charge of sex discrimination with the Illinois Department of Human Rights and with the federal Equal Employment Opportunity Commission (EEOC). Sometime later, Cladis was transferred to the Naperville store. The defendant claims that it transferred Cladis due to the negative reaction of his fellow Joliet employees, who

blamed him for Hossack's termination. In October of 2002, Cladis and Lenz left FCA's employment to work for a competitor.

After 180 days passed without any proceedings or resolution of the dismissal, the EEOC issued Hossack a Notice of Right to Sue. She filed suit in federal court against Floor Covering Associates of Joliet, seeking relief for sex discrimination pursuant to Title VII of the Civil Rights Act of 1964, as amended. 42 U.S.C. §§ 2000e-2(a), *et seq.* The case proceeded to trial, and the defendant moved for judgment as a matter of law at the close of the plaintiff's case in chief. *See* Federal Rule of Civil Procedure 50(a). The court took the motion under advisement and explained that, even though Hossack failed to establish a prima facie case under the indirect, burden-shifting test set forth in *McDonnell Douglas Corporation v. Green,* 411 U.S. 792, 802 (1973) or demonstrate that the defendant's reasons for its actions were pretexts for discrimination, she could nevertheless submit her case to the jury under a direct method or mixed-motive theory to the panel. The defendant renewed its Rule 50(a) motion for judgment as a matter of law at the close of the evidence. The court took that motion under advisement pending the jury's verdict. The court submitted the case to the jury after giving a mixed-motive instruction. The jury found in favor of Hossack and awarded her $250,000 in damages. The court accepted the verdict and entered judgment, and the defendant renewed its motion for judgment as a matter of law. *See* Federal Rule of Civil Procedure 50(b). The court subsequently issued a written decision granting the defendant's motion and vacated the jury's verdict. The court reasoned that, when considering the evidence, no reasonable jury could have found that Hossack was a victim of intentional discrimination without indulging in speculation.

## II. ANALYSIS

On appeal, this court conducts a *de novo* review of a district court's decision when faced with the question of whether or not to grant a motion for judgment as a matter of law, *see Walker v. Bd. of Regents of the Univ. of Wisconsin Sys.,* 410 F.3d 387, 393 (7th Cir. 2005), and is "obliged to leave the judgment undisturbed unless the moving party can show that 'no rational jury could have brought in a verdict against [it].'" *Woodward v. Corr. Med. Servs. of Illinois, Inc.,* 368 F.3d 917, 926 (7th Cir. 2004). In reviewing the district court's decision, this court "examin[es] the record as a whole to determine whether the evidence presented, combined with all reasonable inferences permissibly drawn therefrom, was sufficient to support the jury verdict of sex discrimination.*" Walker*, 410 F.3d at 393. "[A] mere scintilla" of evidence supporting the jury's verdict will not suffice. *Id*. Although the court reviews the record as a whole, it must disregard all evidence favorable to the moving party that the jury was not required to believe. *See Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 151 (2000). That is, the court must give credence to the "evidence supporting the moving party that is, uncontradicted and unimpeached, at least to the extent that the evidence comes from disinterested witnesses." 9A C. Wright & A. Miller, Federal Practice and Procedure § 2529, p. 300 (2d ed. 1995). This court can neither reweigh the evidence nor make its own credibility determinations. *See Appelbaum v. Milwaukee Metro. Sewerage Dist.,* 340 F.3d 573, 579 (7th Cir. 2003).

In this case, Hossack is seeking relief pursuant to Title VII. Title VII provides that it is an "unlawful employment practice for an employer . . . to discriminate against any individual . . . because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).

An unlawful employment practice is established when a plaintiff demonstrates that a protected characteristic, such as sex, was a motivating factor for an employment decision. The trial court characterized this case as a mixed motive case, and the parties agreed. A mixed motive case is one in which both legitimate and illegitimate reasons motivate an employment decision. An employer can avoid a finding of liability in such a case by proving that it would have made the same decision even if it had not allowed sex to play a discriminatory role, and even though other permissible factors also motivated the decision. *See* 42 U.S.C. § 2000e-2(m); *see also Desert Palace, Inc. v. Costa*, 539 U.S. 90, 92-95 (2003). To prove that sex was a motivating factor, a plaintiff must demonstrate that her sex was one of the reasons that the employer took adverse action against her.

A plaintiff may establish sex discrimination under Title VII by either of two means: the "indirect method" or the "direct method." *See Rogers v. City of Chicago,* 320 F.3d 748, 753 (7th Cir. 2003). Under the indirect method, the burden shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973), is used. Under this approach, a plaintiff must first establish a prima facie case of discrimination by demonstrating that (1) she is a member of a protected class; (2) her performance met her employer's legitimate expectations; (3) despite this performance, she was subjected to an adverse employment action; and (4) her employer treated similarly situated employees outside of the protected class more favorably. If she succeeds, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for its decision, which the plaintiff can then attack as a pretext for discrimination. *See Barricks v. Eli Lilly and Co.,* No. 05-3771, 2007 WL 983220, at *2 (7th Cir. April 4, 2007). The burden of persuasion always remains with the plaintiff.

In this case, the defendant did not move for summary judgment prior to trial. Therefore, the question of whether the plaintiff could establish a prima facie case was never tested. During the trial, after the defendant moved for judgment as a matter of law at the close of the plaintiff's case in chief, the court ruled that this was not an indirect proof case because the plaintiff could not prove that Cladis, who was not fired, was a similarly situated employee whose treatment could be compared to hers. Before taking the motion under advisement, the court told the plaintiff that, because she was unable to prove her case under the indirect method, she would have to rely on the direct proof she had presented.

The parties and the district court were in error, however, in proceeding as if this is an employee discipline case. At trial, FCA's president and owner, Robert Hill, testified that neither FCA nor the Joliet store had any policy forbidding employee affairs. Defense counsel asked Hill: "Are you aware whether any employees have had a romantic relationship while employed at Floor Covering Associates of Joliet, Inc.?" To which Hill replied: "Yes, sir, I am." He then went on to explain that:

> I'm aware that in the Joliet store today of 17 people over the past number of years there have been 12 employees or more—12 employees that I know of who have had romantic relationships with other employees.

Transcript at 362. Hill also stated that none of these employees had been fired or disciplined because of engaging in a romantic relationship.

Throughout the trial, all of the employees of the defendant that were called to testify doggedly maintained that Hossack had voluntarily resigned. The jury rejected that explanation in its special verdict. This court agrees with the jury's verdict on this question and the defendant has abandoned this position on appeal. The defendant also

presented testimony that Hossack was terminated not only because management feared that her husband might very well cause workplace disruption, but also because Cladis was the top salesman and producer at the Joliet store. The record clearly establishes that the defendant did not discipline either Hossack or Cladis for having an affair. Therefore, Hossack was in error when she attempted to establish that she was similarly situated to Cladis. She was similarly situated only to other employees who threatened to cause workplace disruption. The plaintiff failed to make this comparison and also failed to identify any other employees similarly situated. Consequently, she failed to establish a prima facie case of sex discrimination.

On appeal, the parties continue to argue about the prima facie case, but it is irrelevant because this court has ruled that, once a case reaches trial, the *McDonnell Douglas* burden shifting framework should no longer be considered. *See Harvey v. Office of Banks and Real Estate,* 377 F.3d 698, 708 (7th Cir. 2004). *See also Hall v. Gary Cmty. Sch. Corp.,* 298 F.3d 672, 675 (7th Cir. 2002) (the burden shifting framework is "unnecessary when reviewing judgments as a matter of law"). During and after any Title VII trial, the sole legal issue is whether the plaintiff presented sufficient evidence to permit a rational jury to determine that she was the victim of intentional discrimination, *see Massey v. Blue Cross-Blue Shield of Illinois,* 226 F.3d 922, 925 (7th Cir. 2000). In addition, the United States Supreme Court has ruled that once a defendant comes forward with a nondiscriminatory reason for its action, the *McDonnell Douglas* framework "simply drops out of the picture." *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 510-11 (1993).

Under the direct method of proving a Title VII case, a plaintiff may present either direct or circumstantial evidence of discrimination. *See, e.g.*, *Walker v. Glickman,* 241 F.3d 884, 888 (7th Cir. 2001). "Direct evidence is

evidence which if believed by the trier of fact, will prove the particular fact in question without reliance on inference or presumption." *Id.* It typically "relate[s] to the motivation of the decisionmaker responsible for the contested decision,*" see Sheehan v. Donlen Corp.,* 173 F.3d 1039, 1044 (7th Cir. 1999) (citation omitted), and "can be interpreted as an acknowledgment of discriminatory intent by the defendant or its agents," *see Troupe v. May Dept. Stores,* 20 F.3d 734, 736 (7th Cir. 1994). Stated differently, direct evidence "essentially requires an admission by the decision-maker that his actions were based on the prohibited animus." *Radue v. Kimberly-Clark Corp.,* 219 F.3d 612, 616 (7th Cir. 2000). As such, because admissions are exceedingly rare in modern employment discrimination cases, "under the direct method we now also allow circumstantial evidence to be introduced." *Hottenroth v. Village of Slinger,* 388 F.3d 1015, 1028 (7th Cir. 2004). Circumstantial evidence, unlike direct evidence, need not directly demonstrate discriminatory intent, but rather it "allows a jury to infer intentional discrimination by the decisionmaker" from suspicious words or actions. *See Rogers,* 320 F.3d at 753.

We have previously identified three types of circumstantial evidence of particular relevance when establishing the inference of intentional discrimination in Title VII cases.

> The first [and most common] consists of suspicious timing, ambiguous statements oral or written, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn. . . . Second is evidence, whether or not rigorously statistical, that employees similarly situated to the plaintiff other than in the characteristic (pregnancy, sex, race, or whatever) on which an employer is forbidden to base a difference in treat-

ment received systematically better treatment. And third is evidence that the plaintiff was qualified for the job in question but passed over in favor of (or replaced by) a person not having the forbidden characteristic and that the employer's stated reason for the difference in treatment is unworthy of belief, a mere pretext for discrimination.

*Troupe,* 20 F.3d at 736 (citations omitted). Each type of circumstantial evidence is sufficient in and of itself to support a judgment for the plaintiff; however, bits of circumstantial evidence may also be used to compose a convincing mosaic of discrimination. *See id.*

Guided by these evidentiary principles, this court must decide whether the trial court should have vacated the jury's verdict and granted judgment in favor of the defendant as a matter of law. *See* Federal Rule of Civil Procedure 50(b). "Whether judgment as a matter of law is appropriate in any particular case will depend on a number of factors. Those include the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law." *See Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 148-49 (2000). The question in this case is whether the plaintiff has produced sufficient evidence for a rational jury to conclude that she was discriminated against and discharged because she is a woman. The Supreme Court set the parameters for sufficiency of the evidence in *Reeves v. Sanderson Plumbing Prod., Inc.,* 530 U.S. 133 (2000), an age discrimination case. In that case, the district court denied two motions for judgment as a matter of law and entered judgment in favor of the plaintiff. The Fifth Circuit reversed, holding that the plaintiff had not introduced enough evidence to sustain the jury's finding of unlawful discrimination,

even though the court did concede that the plaintiff had produced sufficient evidence that the defendant's explanation for its employment decision was pretextual. The Supreme Court reversed and held that the plaintiff did not have to produce additional independent evidence of discrimination. The court held that "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Id.* at 148.

Under the *Reeves* standard and considering the totality of the circumstances, *see Harvey v. Office of Banks and Real Estate,* 377 F.3d 698, 707-08 (7th Cir. 2004), Hossack has not introduced sufficient evidence of intentional discrimination. The quantum of proof adduced by Hossack is less than that presented by the plaintiff in *Reeves* wherein the plaintiff established both a prima facie case and pretext. Even though the jury had an adequate basis to reject the defendant's contention that Hossack resigned and find that she was fired, it is uncontroverted in the record that Hossack was terminated because management feared her husband's threats and that he might very well cause workplace disruption in the future, while Cladis was not discharged because he was the top earning salesman at the Joliet store and, thus, was more important to the organization. We also wish to make clear that the defendant-appellee had never in its history terminated an employee for having an illicit affair, and there is no direct evidence to establish that the defendant's alternative explanations (Cladis was the top salesman at the Joliet store and that management was afraid of Hossack's husband) were pretexts unworthy of belief. *See id.* at 148 ("an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other nondiscriminatory reason for the employer's decision"). The best the plaintiff could establish

in response was to point out that her husband, although he was distraught (and rightly so) and making threats, never actually crossed the threshold of the Joliet store and has never harmed anyone employed there. She could have done more. Presented with this evidence, no rational jury could have found for the plaintiff.

Because we agree with the decision of the trial court judge and are convinced that no reasonable jury could find that the defendant terminated Hossack's employment because she is a woman, the district court's grant of judgment as a matter of law in this case IS AFFIRMED.

A true Copy:

Teste:

_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*